**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **FirstString Research, Inc.,**<br><br>    *Plaintiff,*<br><br>**v.**<br><br>**Regranion, LLC; JT Pharmaceuticals, Inc.;<br>Gautam Ghatnekar; James McNab; and<br>Stefanie Cuebas,**<br><br>    *Defendants.* | **Civil Action No.**<br><br>**COMPLAINT FOR VIOLATIONS OF:**<br><br>  **(1) Computer Fraud and Abuse Act (18 U.S.C. § 1030)**<br>  **(2) Defend Trade Secrets Act (18 U.S.C. § 1836)**<br>  **(3) South Carolina Trade Secrets Act (S.C. Code § 39-8-30)**<br>  **(4, 6) Breach of Contract**<br>  **(5) Breach of Contract Accompanied by Fraudulent Act**<br>  **(7, 8, 9) Breach of Fiduciary Duty**<br>  **(10) Aiding and Abetting Breach of Fiduciary Duties**<br>  **(11, 12) Tortious Interference with Contract**<br>  **(13) Civil Conspiracy**<br>  **(14) Equitable Forfeiture**<br>  **(15) Accounting**<br><br>**<u>JURY TRIAL and INJUNCTIVE RELIEF REQUESTED</u>** |

Plaintiff FirstString Research, Inc. ("FirstString" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants Regranion, LLC ("Regranion"), JT Pharmaceuticals, Inc. ("JT Pharma"), Gautam Ghatnekar ("Ghatnekar"), James McNab ("McNab"), and Stefanie Cuebas ("Cuebas"), and alleges the following:

**NATURE OF THE CASE**

1.      Plaintiff FirstString is a Charleston-based biotechnology company dedicated to developing breakthrough wound-healing and inflammatory response therapies.  FirstString brings this action to obtain an injunction against Defendants Ghatnekar and McNab, its former CEO and chairman, and their co-conspirators, so as to prevent further irreparable injury resulting from their theft of FirstString's trade secrets, inventions, and other intellectual property.  FirstString also seeks to remedy the damages flowing from Defendants' misconduct, which amount to at least $28 million to date.

2.      While serving as FirstString's CEO and chairman, Ghatnekar and McNab secretly operated their side businesses—Regranion and JT Pharma, respectively—using FirstString's computers, employees, and other resources while concealing those facts from the company's Board and its investors.  Ghatnekar and McNab built those businesses on the back of corporate opportunities, inventions, trade secrets, and resources that they willfully misappropriated from FirstString—and they used their positions of authority to hide their misconduct from FirstString, its board, and its investors.

3.      But Ghatnekar and McNab did not act alone.  Cuebas, FirstString's former Director of Operations, actively assisted Ghatnekar and McNab in both willfully misappropriating FirstString property and hiding their wrongdoing from others.  When FirstString finally learned of their scheme, Cuebas played a principal role in Defendants' final cover-up by destroying key documents and by wiping FirstString computers and e-mail accounts, among other things.

4.      At every opportunity, Ghatnekar and McNab abused their position of trust and confidence to benefit themselves.  For example, while serving as CEO of FirstString, Ghatnekar secretly developed an invention that belonged to FirstString pursuant to the Inventions Agreement by which he was bound.  Ghatnekar then conspired with McNab to submit a patent application for that invention that listed Ghatnekar as the inventor and JT Pharma as the owner.  JT Pharma then sold its rights to the application to Titan Pharmaceuticals, Inc. ("Titan"), a company for which McNab serves as a director.  Ghatnekar and McNab also applied for, and secured, multiple research

grants for Regranion and JT Pharma based on trade secrets and other inventions owned by FirstString.  Ghatnekar and McNab never informed FirstString of those grants and never provided any of the resulting funding to FirstString, even though they listed FirstString's address on the grant applications.  Instead, Ghatnekar and McNab lied to FirstString and its investors by repeatedly—and falsely—affirming that they had assigned all such inventions to FirstString.

5.      Ghatnekar and McNab did not just passively abuse their positions of authority at FirstString; they used those positions to recruit FirstString employees (including Cuebas) to perform secret work for Regranion and JT Pharma in direct violation of Ghatnekar's contractual agreement not to "solicit, induce, recruit or encourage" employees of FirstString to work either for himself "or for any other person or entity."  Ghatnekar referred to these employees as his "inner circle" and swore them to secrecy, instructing them to hide Regranion's and JT Pharma's existence from FirstString but to use FirstString's facilities and resources in their secret work for Regranion and JT Pharma.  Ghatnekar told his "inner circle" that he considered Regranion his "trap door" if FirstString was not successful.

6.      These actions were in brazen violation of their fiduciary duties and contractual obligations, but Ghatnekar and McNab actively concealed their wrongdoing while continuing to pay themselves substantial cash and equity compensation valued at more than $10 million.

7.      FirstString is still in its development stage and does not generate revenue from the sale of products.  Instead, it survives on funds from investors, who put their trust and confidence in Ghatnekar and McNab to develop therapies that can be brought to market, and on grants it receives to develop those therapies. To continue the flow of money necessary to finance their side businesses, Ghatnekar and McNab repeatedly made misrepresentations in response to due diligence inquiries that duped investors into investing more than $67 million over four different fundraising rounds.  In each round, Ghatnekar and/or McNab executed agreements representing that they were in full compliance with their Inventions Agreements.  This was false, as Ghatnekar and McNab were both in gross violation of those agreements.

8.      Ghatnekar and McNab also secretly paid each other large "consulting" fees from Regranion and JT Pharma, funded by the research grants secured with stolen FirstString property. They never informed FirstString of these fees, and the receipt of these fees violated Ghatnekar's contractual obligation not to "render to others services of any kind for compensation" without FirstString's prior consent.

9.      Once caught, Defendants engaged in a systematic effort to transfer FirstString's data to themselves while endeavoring to wipe clean any evidence of that effort.  To that end, Ghatnekar set up automatic forwarding of his FirstString e-mail to his personal e-mail.  Ghatnekar also removed his FirstString laptop from the office, transferred all of the data onto a new personal laptop, and then proceeded to delete unknown amounts of data off of both devices.  To date, Ghatnekar has refused to return any of the multiple phones that he used for FirstString business and which contain substantial FirstString data—including information regarding FirstString's bank accounts.  In addition to assisting Ghatnekar in transferring data to his personal laptop, Cuebas also deleted emails from her FirstString e-mail account and, without authorization, took a FirstString computer that contained information concerning her work for Regranion and JT Pharma.

10.     While Defendants' destruction of evidence means that the full scope of their misconduct is not yet clear, they conspired to, and did, steal FirstString's trade secrets and other property, violated their duties to FirstString, breached and tortiously interfered with their contracts with FirstString, and misused FirstString's computer systems to hide their misconduct.  FirstString therefore brings this action to enjoin Defendants' continued misconduct and to recover all resulting damages.

## PARTIES

11.     FirstString is a Delaware corporation with its principal place of business in Charleston County, South Carolina.

12.     Regranion is a limited liability company organized under the laws of the State of South Carolina, with its principal place of business in Charleston County, South Carolina.  It is a

clinical stage pharmaceutical company focusing on inflammatory response treatments. On information and belief, Regranion acts only at the direction and under the control of Ghatnekar, its Chairman.

13.     JT Pharma is a peptide-drug development company incorporated in Delaware with its principal place of business in Charleston County, South Carolina. On information and belief, JT Pharma acts only at the direction and under the control of McNab, its Chairman.

14.     Ghatnekar is a resident of South Carolina. He was FirstString's president and chief executive officer from 2009 until he was fired for cause on September 1, 2021. He is also the Chairman of Regranion and serves as both a board member and paid consultant to JT Pharma.

15.     McNab is a resident of South Carolina. McNab was chairman of FirstString from 2009 until he was asked to resign in 2019. He is also the chairman and chief executive officer of JT Pharma and a paid consultant to Regranion. McNab formerly served as a board member of Curis, Inc., and currently serves as a board member of Titan.

16.     Cuebas is a resident of South Carolina. She served as the Director of Operations at FirstString from 2009 until her departure in October 2021. Upon information and belief, she also serves in an administrative and record-keeping role at Regranion and JT Pharma.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over FirstString's claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, and Computer Fraud and Abuse Act, 18 U.S.C. § 1830, because those claims arise under the laws of the United States. *See* 28 U.S.C. § 1331. The Court also has subject matter jurisdiction over FirstString's state law claims because they are so related to its federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367.

18.     The Court has personal jurisdiction over each of the Defendants because Ghatnekar, Cuebas, and McNab are residents of South Carolina, and Regranion and JT Pharma have their principal place of business in South Carolina.

19.     Venue is proper in the United States District Court for the District of South Carolina, Charleston Division, because each of the Defendants reside in South Carolina and a

substantial part of the events giving rise to the claims occurred in Charleston County, South Carolina.  *Id.* § 1391; Local Civ. Rule 3.01(A)(1) (D.S.C.).

## OVERVIEW

20.    FirstString is a biotechnology company co-founded by Ghatnekar in 2005. FirstString develops pharmaceutical drugs and runs both clinical trials and a research and development ("R&D") wing.

21.    FirstString develops potentially revolutionary inflammatory response treatments with a variety of applications, including at least four indications of an inflammatory response drug in Phase 2 or 3 clinical trials.  Those indications include applications for the treatment of cutaneous radiation injury, the treatment of cutaneous scarring from breast surgery, and healing and treatment of burns and related injuries.  But because FirstString does not yet generate revenue from sales, essentially all of this critically important work is funded by grants and investors.

22.    To attract investment, FirstString relied on Ghatnekar's and McNab's contractual and fiduciary commitments to devote themselves and their considerable experience to FirstString's success.  Ghatnekar and McNab made contractual commitments to, among other things, assign to FirstString any inventions created while they were engaged by FirstString, as well as to maintain the confidentiality of all FirstString information and not to use any of FirstString's property for their own benefit.  Ghatnekar went even further and agreed to devote *all* of his professional efforts to FirstString's success.  **(Sections A, B.)**

23.    On the back of these commitments, FirstString has raised more than $67 million from investors in four different fundraising rounds—and in connection with each round, Ghatnekar and McNab represented that they remained compliant with their contractual commitments to FirstString.  But those representations were false.  From almost the very beginning of their tenure as FirstString's CEO and chairman, Ghatnekar and McNab hid their conflicted, self-dealing conduct from FirstString, its board, and its investors, and covertly conspired to steal FirstString's property for their own benefit and for the benefit of Regranion and JT Pharma, their secret side companies.  **(Section C.)**

24.     Ghatnekar and McNab began by using FirstString resources to build out the infrastructure supporting their side businesses, including by secretly operating out of FirstString's physical office space, recruiting FirstString employees to work for their companies, and relying on FirstString's connections, processes, and procedures.  **(Section D.)**

25.     Ghatnekar and McNab next used that infrastructure to steal additional property from FirstString, including its trade secrets, know-how, and corporate opportunities.  Among other things, they acquired the rights to develop indications of an additional inflammatory response drug—but they kept that opportunity secret from FirstString.  Instead, they assigned the rights to Regranion and relied on the secret work of FirstString employees to develop and commercialize that drug. **(Section E.)**  They also used inventions belonging to FirstString to apply for a patent on a different drug intended to treat a chronic inflammatory skin condition.  They did not inform FirstString of the patent application—instead, they submitted it on behalf of JT Pharma and then sold it for their own benefit to *another* company where McNab served on the board.  **(Section F.)**

26.     Finally, Ghatnekar and McNab used FirstString's resources to apply for and secure multiple research grants.  But rather than using those funds to further FirstString's business, they instead funneled the grant money to Regranion and JT Pharma—and then used it to pay themselves huge "consulting fees" that they hid from FirstString.  **(Section G.)**

27.     FirstString finally began to learn the truth about McNab's and Ghatnekar's secret activities in August 2021.  **(Section H, I.)**  When their misconduct began to come to light, Ghatnekar and McNab worked together with Cuebas to destroy and steal potentially inculpatory information from FirstString.  As a result, the true scope of their misconduct remains unknown. **(Sections J, K.)**

## STATEMENT OF FACTS

### A.    McNab's Contractual and Fiduciary Duties to FirstString

28.     When McNab became the chairman of FirstString's board, he executed a Consulting Agreement dated January 1, 2009, pursuant to which he received a monthly fee of

$10,000, discretionary bonuses, and equity awards in exchange for, among other things, chairing

the board and "[i]dentifying partnering/licensing prospects and initiating contact." (Consulting

Agreement, §§ 1-2, Ex. A.)

29.    Pursuant to the agreement, McNab agreed to:

> hold in confidence and not use or disclose to any third parties any materials and information of FirstString, or of third parties obtained through FirstString, which are received by Consultant during Consultant's engagement with FirstString and are either marked as confidential or are of a type or are disclosed under circumstances such that a reasonable person would expect them to be held in confidence (collectively, the "<u>Confidential information</u>"). . . . Except as required in the course of Consultant's performance of Services for FirstString, Consultant will not, without FirstString's prior written consent, reproduce, disclose or use such Confidential Information at any time, either during or subsequent to Consultant's engagement by FirstString.

(Consulting Agreement, § 6.)

30.    McNab also agreed to be bound by a Consultant Proprietary Information and

Inventions Agreement ("Consultant Inventions Agreement"). (Consulting Agreement, § 7.) The

Consultant Inventions Agreement defines "Proprietary Information" broadly to include:

> information about trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formulas, business and product development plans, customer lists, terms of compensation and performance levels of Company employees, Company customers and other information concerning the Company's actual or anticipated business, [and] research or development.

(Consultant Inventions Agreement, § B.)

31.    McNab agreed that FirstString owns all "Inventions" that he developed during the

course of his employment at FirstString so long as they were not developed "entirely on [his] own

time without using the Company's equipment, supplies, facilities, or trade secret information."

(Consultant Inventions Agreement, § E.)

32.    McNab further agreed to disclose to FirstString:

> all "Inventions," which includes, without limitation, all
> improvements, inventions, works of authorship, trade
> secrets, technology, designs, formulas, ideas, processes, techniques, know-
> how and data, whether or not patentable, made or discovered or
> conceived or reduced to practice or developed by me, either alone
> or jointly with others, during the term of my consulting relationship.

(Consultant Inventions Agreement, § D.)

### B.    Ghatnekar's Contractual and Fiduciary Duties to FirstString

33.    Ghatnekar initially served as FirstString's chief science officer and was bound by an Executive Employment Agreement dated February 15, 2006, which included an Assignment of Inventions Agreement.  After McNab hired Ghatnekar as CEO in 2009, Ghatnekar executed a new Employment Agreement dated January 1, 2010, as well as an Amended and Restated Employment Agreement dated October 1, 2017.  McNab signed both Agreements on behalf of FirstString in his capacity as chairman.

34.    Under both Agreements, Ghatnekar agreed to "devote [his] full business time, energy and abilities exclusively to the business and interests of" FirstString.  (Employment Agreement, § 8; Restated Employment Agreement, § 8.)  He also agreed not to "render to others services of any kind for compensation" without FirstString's prior consent (*id.*), and not to "solicit, induce, recruit or encourage" employees of FirstString to work either for himself "or for any other person or entity."  (Employment Agreement, § 5(a); Restated Employment Agreement, § 5(a).)

35.    Ghatnekar also agreed to be bound by FirstString's Proprietary Information and Inventions Agreement ("Inventions Agreement").  (*See* Employment Agreement, § 7; Restated Employment Agreement, § 7.)  Pursuant to the Inventions Agreement, Ghatnekar agreed to assign to FirstString "any rights, title and interest" he had or may acquire in "Proprietary Information and all patents, patent rights, copyrights, trade secret rights, trademark rights and other rights (including, without limitation, intellectual property rights) anywhere in the world in connection therewith."  (Inventions Agreement, § B.)  The Inventions Agreement defines "Proprietary Information" broadly to include:

> information about trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formulas, business and product development plans, customer lists, terms of compensation and performance levels of Company employees, Company customers and other information concerning the Company's actual or anticipated business, [and] research or development.

(Inventions Agreement, § B.)

36.     Ghatnekar also agreed that FirstString owns all "Inventions" that he developed during the course of his employment at FirstString.  (Inventions Agreement, § E.)  Ghatnekar further agreed to disclose to FirstString:

> all "Inventions," which includes, without limitation, all improvements, inventions, works of authorship, trade secrets, technology, designs, formulas, ideas, processes, techniques, know-how and data, whether or not patentable, made or discovered or conceived or reduced to practice or developed by me, either alone or jointly with others, during the term of my consulting relationship.

(Inventions Agreement, § D.)

37.     The Inventions Agreement includes a narrow exception, providing that FirstString would not own any Inventions that Ghatnekar developed "entirely on [his] own time without using the Company's equipment, supplies, facilities, or trade secret information."    (Inventions Agreement, § E.)

## C.     McNab and Ghatnekar Hide Their Misconduct From FirstString, its Board, and its Investors

38.     Rather than complying with their contractual and fiduciary duties, McNab and Ghatnekar used their positions of power and authority to hide their misconduct from FirstString, its board, and its investors.

39.     McNab and Ghatnekar never informed FirstString's board either of their involvement with Regranion and JT Pharma, of their misappropriation of FirstString's trade secrets, inventions, and other property, or of any of the many conflicted transactions and dealings that they entered into to benefit themselves to the detriment of FirstString.  Nor did they ever seek

approval for their involvement with Regranion and JT Pharma—either from the board as a whole or from any individual board member or executive other than themselves.

40.    In fact, none of the other members of FirstString's board had even heard of Regranion until they first learned of McNab and Ghatnekar's schemes in August 2021, as detailed in Section I.  Nor were any other board members aware that McNab was using JT Pharma to misappropriate FirstString's opportunities, trade secrets, resources, and other property.

41.    As a result of McNab's and Ghatnekar's concerted efforts, FirstString and its board could not have learned of their misconduct and, in fact, did not discover such misconduct until August 2021.

42.    McNab and Ghatnekar also doubled down on their misrepresentations to hide their misconduct from FirstString's investors.

43.    Because FirstString's products are all in R&D or clinical stages, it does not yet generate revenue.  Instead, FirstString relies on grants and outside investment to finance its extensive development work—and both FirstString and its investors relied on Ghatnekar's and McNab's commitments to devote themselves to FirstString's success.  As such, each of FirstString's recent fundraising disclosures incorporate representations from Ghatnekar and McNab (among others) that they were in compliance with their various contractual and fiduciary duties.

44.    On October 2, 2017, Ghatnekar executed FirstString's Series B Preferred Stock Purchase Agreement (the "Series B") and represented that, pursuant to the terms of FirstString's Inventions Agreement, he had disclosed all of his "works or inventions" to FirstString.  (Series B § 2.19.)  He also represented that "[e]ach employee and consultant has assigned to [FirstString] all intellectual property rights he or she owns that are related to [FirstString's] business as now conducted and as presently proposed to be conducted."  (*Id.* § 2.8(b).)

45.    On March 1, 2019, Ghatnekar executed FirstString's Series C Preferred Stock Purchase Agreement (the "Series C") and again represented that he had disclosed all of his works or inventions and properly assigned them to FirstString.  (Series C §§ 2.8(b), 2.19.)

46.     Yet again, on May 17, 2021, Ghatnekar executed FirstString's Series D Preferred Stock Purchase Agreement (the "Series D"), representing that he had disclosed all of his works or inventions and properly assigned them to FirstString.  (Series D §§ 2.8(b), 2.19.)

47.     Each of these representations was a lie.  Ghatnekar deliberately hid the existence of inventions belonging to FirstString and, instead, conspired with McNab and Cuebas to use those inventions for their own personal benefit.

48.     Nevertheless, based on these false representations, FirstString has raised more than $67 million from investors.  Ghatnekar and McNab caused FirstString to use a substantial portion of that amount to pay them cash and equity compensation.  For example, Ghatnekar received more than $3,000,000 in cash compensation from FirstString, as well as equity awards valued in excess of $5,000,000, all following the Series B round of funding.  McNab received more than $1 million in consulting fees from FirstString, as well as equity awards worth more than $1 million.

**D.     McNab and Ghatnekar Misappropriate FirstString Personnel and Resources to Build their Secret Side Businesses**

49.     Almost from the very beginning of their tenure as FirstString's chairman and CEO, McNab and Ghatnekar reached an agreement to enrich themselves at FirstString's expense by entering into conflicted, self-dealing transactions that they hid from FirstString, its board, and its investors.

50.     Although McNab and Ghatnekar employed multiple schemes to transfer value from FirstString to themselves, those schemes all involved Regranion or JT Pharma in one manner or another.  The first step of their schemes was therefore to use FirstString resources to build out Regranion and JT Pharma so that they could funnel valuable FirstString property to those companies.

51.     Ghatnekar founded Regranion in 2007, while he was serving as FirstString's chief scientific officer.  McNab founded JT Pharma in 2012, while he was serving as FirstString's chairman.  Neither Ghatnekar nor McNab ever informed FirstString of their secret side companies.

Importantly, McNab and Ghatnekar never notified FirstString's investors of their side businesses and never informed FirstString's board of directors of their side businesses.

52.    Instead, McNab and Ghatnekar began secretly soliciting and recruiting FirstString employees to work for Regranion and JT Pharma while they were supposed to be working for FirstString.    Ghatnekar referred to these recruited employees as his "inner circle," and he prohibited them from disclosing the fact or substance of their work for Regranion or JT Pharma to anyone else at FirstString.

53.    First, in or around 2011, Ghatnekar recruited Cuebas to perform administrative work for Regranion, on FirstString time and using FirstString's resources and facilities.    At that time, Cuebas had been employed by FirstString as its Director of Operations for about two years.

54.    At some point thereafter, McNab and Ghatnekar recruited Cuebas to perform similar administrative work for JT Pharma, on FirstString time and using FirstString's resources and facilities.

55.    McNab, Ghatnekar, and Cuebas hid their involvement with Regranion and JT Pharma from FirstString.

56.    Second, in or around 2015, Ghatnekar recruited and hired Scientist A to work for Regranion.    At the time, Scientist A was employed by FirstString as Senior Director of R&D, and Ghatnekar was Scientist A's boss at FirstString.    Scientist A's secret work on behalf of Regranion involved, among other things, developing licensing and strategic development proposals, technology research, and commercialization strategies.    On information and belief, Ghatnekar directed Scientist A to rely on connections, know-how, processes, and procedures that belong to FirstString in order to advance Regranion's business.

57.    Third, in or around March 2020, Ghatnekar also recruited Scientist B to work for Regranion.    At the time, Scientist B was employed by FirstString as Director of R&D, and Ghatnekar was her boss.    Ghatnekar and Cuebas recruited Scientist B together, telling her that they were "going to make [her] part of the inner circle."    In this initial conversation, Ghatnekar called Regranion his "trap door," which meant that it was a fallback if FirstString did not have continued

success.  Ghatnekar did not ask Scientist B whether she wanted to be involved, but rather he told her that she was going to have to work for Regranion.

58.     Ghatnekar instructed Scientist B to sign an employment agreement with Regranion, under which she was classified as a contractor and paid on a project-by-project basis.

59.     Scientist B began working for Regranion almost immediately, and Ghatnekar soon directed her to enter into discussions with a well-known pharmaceutical company regarding a potential licensing agreement on behalf of Regranion.  From that point on, Ghatnekar frequently instructed Scientist B to work on business development projects for Regranion, including by arranging potential licensing agreements and strategic partnerships.  On information and belief, Ghatnekar directed Scientist B to rely on connections, know-how, processes, and procedures that belong to FirstString in order to advance Regranion's business.

60.     Ghatnekar told Scientist A, Scientist B, and Cuebas—the "inner circle"—that they could not speak about Regranion at FirstString and must keep all of their Regranion work on the "down low."  He told them that Regranion's existence was to be kept secret and instructed them to take all of their Regranion phone calls from home, even during the middle of the workday.  Ghatnekar also purchased a printer to be used at FirstString's offices for Regranion work so that the inner circle could hide their work from other FirstString employees.

61.     Ghatnekar initially told Scientist A and Scientist B that FirstString work should be prioritized over Regranion work.  But Ghatnekar forced them to do Regranion work whenever it was necessary, including during business hours and when they should have been doing FirstString work. Ghatnekar knew that Scientist A, Scientist B, and Cuebas could not do their Regranion work only during off-hours and that it would therefore conflict directly with their duties to FirstString.

62.     As a result, Ghatnekar, Scientist A, Scientist B, and Cuebas were unable to properly perform their FirstString work.  Scientist A and Scientist B missed deadlines and failed to turn in required FirstString work on a timely basis.  And because of Cuebas' work for Regranion and for JT Pharma, she was unable to properly complete her FirstString work.  She often missed deadlines

and failed to timely submit certain grant-application documents because she prioritized her work for Regranion and JT Pharma.

63.     On information and belief, Ghatnekar's work on behalf of Regranion also caused him to fail to perform necessary services on behalf of FirstString on a timely basis.

**E.     McNab and Ghatnekar Secretly License a Drug for Regranion's Benefit**

64.     In or around 2014, Ghatnekar caused Regranion to license the rights to RGRN-305, a failed oncology drug that had originally been developed by Curis, Inc. ("Curis").  At the time, McNab served as the chairman of FirstString, a board member at Curis, and a paid consultant for Regranion.

65.     As the chairman of the board of FirstString, McNab had a fiduciary duty not to misappropriate any corporate opportunity for himself or his other companies.  And as FirstString's CEO, Ghatnekar also had a fiduciary duty not to misappropriate any corporate opportunity for himself or his companies.

66.     McNab and Ghatnekar ignored these duties and hid the opportunity from FirstString's board.  Instead, McNab directed the RGRN-305 opportunity to Regranion where both McNab and Ghatnekar could profit in their capacities as owner of and consultant to Regranion.  At no time did McNab or Ghatnekar present the opportunity to FirstString or its board, and the board was never made aware either of the opportunity or that Ghatnekar had licensed RGRN-305 for the benefit of Regranion.

67.     On information and belief, Ghatnekar believed that through Regranion, he could develop commercial applications for RGRN-305 either as a topical or oral treatment for inflammatory skin diseases—a similar space to the one in which FirstString operates.  Regranion did not pay Curis for the license outright, but rather agreed to future milestone payments.  That is, Regranion agreed to pay Curis only after hitting certain development benchmarks in clinical trials.

68.     With the help of Cuebas and other FirstString employees, and at least one FirstString consultant, Ghatnekar began developing and testing both topical and oral indications

of RGRN-305 to be used to treat dermatological issues. Cuebas hid her involvement with Regranion from FirstString and did not tell FirstString about the RGRN-305 opportunity.

69.     Ghatnekar also directed Scientist A and Scientist B—his "inner circle"—to help him develop RGRN-305 for Regranion's benefit. Among other things, Ghatnekar directed Scientist A and Scientist B to develop commercialization strategies for RGRN-305, as well as to solicit potential partners either with the resources to pay Regranion to develop certain indications or who wanted to license RGRN-305 from Regranion.

70.     For instance, in or around January 2021, Ghatnekar ordered Scientist B to attend the 2021 Dermatology Summit on behalf of Regranion to develop and pursue opportunities relating to RGRN-305. The 2021 Dermatology Summit was a virtual week-long conference beginning on January 8. Scientist B attended the conference Monday through Friday, from 9 a.m. until 5 p.m. each day. Ghatnekar required her to take numerous business development calls, all of which were on behalf of Regranion. On these calls, Scientist B presented slide decks to a potential strategic partner, answered the potential partner's questions, and sent them relevant clinical data, among other things. As a result of Scientist B's efforts, Regranion and the other company reached a tentative licensing agreement.

71.     Ghatnekar directed Scientist B to lie to FirstString about her whereabouts and activities during the time she was attending the Dermatology Summit to hide the fact that she was working for Regranion.

72.     On information and belief, Regranion has secured at least one contract with a foreign company under which it has received or will receive between $5,000,000 and $10,000,000 in connection with development of RGRN-305.

**F.     McNab and Ghatnekar Apply for a Patent on Behalf of JT Pharma Using Stolen FirstString Trade Secrets**

73.     McNab and Ghatnekar also used and disclosed the stolen and misappropriated FirstString trade secrets and other property to secretly benefit JT Pharma, McNab's side business.

74.    On June 5, 2017, for instance, Ghatnekar and McNab filed a patent application based on trade secrets they developed during their employment with FirstString—and which therefore were FirstString property.

75.    Ghatnekar and McNab did not inform FirstString either of their use of FirstString property or of their submission of a patent application.  Nor did they apply for the patent on behalf of FirstString.  Instead, Ghatnekar and McNab submitted an application that listed Ghatnekar as the inventor and JT Pharma as the owner—even though they listed *FirstString's* address on the application.

76.    That patent application is titled "Sustained Release Compositions of Kappa-Opioid Receptor Agonist" (the "JT-09 Patent Application").  It concerns a drug for the treatment of chronic pruritus, an issue concerning dermatological inflammation.  That is, the invention concerns the same space in which FirstString operates—but Ghatnekar and McNab nevertheless conspired to steal the invention and patent it for their own benefit.

77.    On information and belief, Ghatnekar and McNab developed both the JT-09 Patent Application itself and the underlying inventions using resources, staff, time, and property of FirstString.  Neither Ghatnekar nor McNab developed the JT-09 Patent Application entirely on his own time or without using FirstString's equipment, supplies, facilities, or trade secret information—as evidenced by the inclusion of FirstString's address on the application itself, among other things.

78.    Accordingly, pursuant to Ghatnekar's Inventions Agreement and McNab's Consultant Inventions Agreement, both the underlying trade secrets and the JT-09 Patent Application itself are FirstString property.  But neither Ghatnekar nor McNab disclosed the existence of the trade secrets and other inventions supporting the patent application to FirstString.  They also kept the patent application itself a secret from FirstString.

79.    Instead, on or about October 28, 2020, Ghatnekar, McNab, and JT Pharma sold the JT-09 Patent Application to Titan in exchange for payments at some ill-defined future date.  At all relevant times, McNab was on the board of Titan.

80.     In other words, McNab applied for a patent using stolen FirstString trade secrets and inventions and then *sold it to himself* for no money—all without informing FirstString.

81.     According to a contemporaneous press release, Titan raised approximately $8,000,000 in financing in connection with the acquisition of the JT-09 Patent Application that belonged to FirstString.

82.     Because McNab and Ghatnekar hid the existence of both JT-Pharma and the JT-09 Patent Application from FirstString, FirstString was unable to discover the theft of its trade secrets.

**G.     McNab and Ghatnekar Secure Valuable Grants for Regranion and JT Pharma— And Use That Money to Pay Themselves "Consulting" Fees**

83.     Based on the FirstString property that McNab and Ghatnekar willfully misappropriated for their own benefit—including FirstString's trade secrets, corporate opportunities, employees, facilities, know-how, and other resources—they also successfully secured valuable research grants for the benefit of Regranion and JT Pharma.

84.     On information and belief, both Regranion and JT Pharma have received significant grant funding from either the NIH, DOD, or both, based on the work performed by FirstString employees on FirstString time and using FirstString facilities.

85.     McNab, Ghatnekar, and Cuebas regularly listed FirstString's address on Regranion's and JT Pharma's grant applications.

86.     But neither McNab nor Ghatnekar ever disclosed either those applications or the resulting funding to FirstString.  Instead, they hid the grant applications and awards from FirstString and kept all such funding for their own benefit.

87.     In fact, McNab and Ghatnekar caused JT Pharma and Regranion to pay them large consulting fees—including fees from JT Pharma to Ghatnekar of at least $500,000, and undisclosed fees from Regranion to McNab.

**H.     FirstString Forces McNab to Resign as Chairman for Misconduct**

88.     In 2019, FirstString learned that McNab was trying to secretly orchestrate a reverse merger between FirstString and Titan (where he sits on the board).

18

89.    Although the FirstString board had already flatly rejected McNab's prior proposals regarding such a transaction with Titan, he went behind the board's back and created an audio recording on which Ghatnekar expressed support for such a transaction, which he then sent to the board of Titan in an attempt to manufacture support for the transaction.

90.    When it learned of his misconduct, FirstString asked McNab to tender his resignation, which he did.  At the time, FirstString thought that Ghatnekar had no involvement in McNab's misconduct and that McNab had created the audio recording without Ghatnekar's knowledge.  For that reason, FirstString did not simultaneously ask Ghatnekar to resign.

91.    After his resignation, McNab was no longer authorized to have any involvement with FirstString, its facilities, or its personnel.

92.    Unbeknownst to FirstString, however, McNab continued to secretly employ FirstString employees (including Cuebas) to work for JT Pharma.  McNab also continued to use FirstString's address on grant applications and other documents on behalf of JT Pharma.  At the time, FirstString was unaware of McNab's continued misuse and misappropriation of FirstString resources because he took steps to hide his misconduct.

## I.    The Truth Begins to Come to Light

93.    FirstString first learned the truth about McNab's and Ghatnekar's theft and misappropriation of trade secrets and other FirstString property in or around August 2021.

94.    Part of the reason why it was so difficult for FirstString to discover the misconduct was McNab, Ghatnekar, and Cuebas purchased and used multiple computers and cellphones and successfully hid all Regranion and JT Pharma documents and information from FirstString. McNab and Ghatnekar also repeatedly lied to FirstString, its board, and its investors—including both in written disclosures, and orally in board meetings and elsewhere.

95.    But in or around August 2021, Ghatnekar called FirstString Board Member Neal McConnell from a number that McConnell did not recognize and from which Ghatnekar had never before called him.  McConnell looked up the number and learned that it was associated with

Regranion, a company he had never heard of.  The FirstString board then began to investigate Ghatnekar and Regranion, and subsequently learned about McNab and JT Pharma, as well.

96.     Over the following week, McConnell, Tony Bartsh (FirstString's current chairman), and FirstString's corporate lawyer had multiple conversations with Ghatnekar regarding the revelations about his secret misconduct.  In response to initial questions, Ghatnekar repeatedly lied about Regranion's business, including saying that it was a consulting company, that it was not active, and that no other FirstString employees were involved.  None of those statements is true.

97.     Shortly thereafter, however, Ghatnekar began to admit the truth—at least in part. He admitted that he started Regranion in 2007 while he was chief scientific officer at FirstString. He also admitted that he owned Regranion and that he, on behalf of Regranion, licensed the rights to RGRN-305 from Curis without bringing the opportunity to FirstString or otherwise informing FirstString of Regranion's existence or activities.

98.     When Bartsh asked Ghatnekar why Scientist A's name was listed on one of Regranion's grant applications, Ghatnekar again lied and said it was to benefit her career even though she had no involvement.  That is false.  Her name was on the grant application because she worked on the application at Ghatnekar's instruction.

99.     Ghatnekar said he had not done any work for Regranion since January 2018.  That is also false because, among other things, he recruited Scientist B and directed her to perform work for Regranion beginning in 2020.

**J.     Ghatnekar and Cuebas Continue to Lie and Destroy Evidence**

100.     On August 27, 2021, Bartsh sent Ghatnekar a number of questions on behalf of the FirstString board requesting responses by August 30, 2021.

101.     On August 30, 2021, Bartsh sent Ghatnekar an email stating:

> While we await your responses to the questions we posed to you, we instruct you not to destroy, delete, or alter any materials (electronic or otherwise) concerning your employment with FirstString, your involvement with Regranion and any other work you have

undertaken while employed at FirstString including, but not limited to, any patents you have obtained.

102.    Ghatnekar responded through counsel later that same day, but he did not answer any of FirstString's questions.

103.    On August 31, 2021, counsel for FirstString wrote to Ghatnekar's counsel, stating:

> [W]e want to confirm our conversation earlier that your client will return tonight our client's laptop (and all other FirstString devices) and that your client will **not touch (remove, delete or otherwise alter) anything on his FirstString laptop and/or other equipment of any kind.**
>
> We agree to take a forensic image of the laptop and at that point we can discuss with you a protocol for return of your client's personal items.
>
> We await to hear from you tonight regarding when the Company materials will be returned.

104.    That same day, Ghatnekar's counsel responded:

> Gautam has copied the hard drive of his FirstString computer onto his personal computer.  After doing so, he deleted all FirstString files on the personal computer and all personal files on the FirstString computer.  Gautam has also deleted a folder in which he solely kept Regranion information from his FirstString computer.

105.    In response, FirstString's counsel explained that Ghatnekar had "intentionally destroyed evidence and also destroyed metadata" which "therefore is an intentional destruction of evidence," all while he "was represented by not one, but two law firms."

106.    On September 1, 2021, after determining that Ghatnekar had violated his Employment Agreements (among other misconduct), the FirstString board fired Ghatnekar for cause.

107.    Later that same day, Ghatnekar surrendered to FirstString's counsel his: (1) FirstString-issued MacBook Pro, (2) personal MacBook Air, (3) FirstString office key card and metal key, (4) passwords for his FirstString accounts, and (5) FirstString company credit card.

108.    On October 14, 2021, through counsel, Ghatnekar finally submitted a letter to the board of FirstString.  He admitted, among other things, that Cuebas, Scientist A, and Scientist B started working for Regranion in 2011, 2015, and 2020, respectively.  He also admitted that Regranion had paid Cuebas approximately $55,000, had paid Scientist A approximately $42,000, and had paid Scientist B approximately $11,200.

109.    In his letter, Ghatnekar also stated that Regranion had worked with Charles River Laboratories, Comparative Biomedical, and Kevin Bittorf.  FirstString had pre-existing relationships with Bittorf (who worked as a consultant for FirstString) and with Charles River (which is a FirstString vendor).  Ghatnekar also stated that he did not have an interest in any patents through Regranion.

**K.     After Ghatnekar's Termination, He Directs Cuebas to Provide Him With Confidential FirstString Documents and to Delete Additional Evidence**

110.    On September 7, 2021, FirstString inadvertently filed a grant application listing Ghatnekar as the principal investigator, which it has since withdrawn.  The grant application was submitted through an eRA Commons account associated with Ghatnekar's FirstString email address, which he was no longer authorized to access following his termination.  Upon information and belief, Cuebas either digitally signed or stamped Ghatnekar's signature on the cover letter of the grant application.

111.    Ghatnekar subsequently learned of the submission of the grant application and obtained a copy of the cover letter.  The only way he could have obtained the cover letter was if he unlawfully accessed FirstString's systems after he had been terminated—either directly or with the help of Cuebas.

112.    On or about October 8, 2021, Cuebas resigned from FirstString.  When she resigned, Cuebas took with her a FirstString computer that she used to perform work for Regranion and JT Pharma.  Cuebas neither sought nor received authorization to take the FirstString computer or any other FirstString property.

113.     On information and belief, at Ghatnekar's and/or McNab's direction, Cuebas deleted documents and information that inculpated herself, Ghatnekar, and McNab from FirstString's computers and email servers before resigning so as to hide the true scope of Defendants' misconduct.

114.     Because of Ghatnekar's and Cuebas' deliberate destruction of evidence, FirstString cannot currently know the full scope of the misconduct perpetrated against it and cannot know the extent to which Defendants continue to profit from stolen FirstString trade secrets and other property.

115.     In light of Defendants' destruction of evidence, FirstString reserves the right to supplement and amend this pleading to add parties, factual allegations, and causes of action, as appropriate, when additional information becomes known.

### COUNT I – COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030, *et seq.*)
### (Against Ghatnekar)

116.     FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

117.     FirstString provided Ghatnekar and Cuebas with FirstString computers, which were intended to be the only computers used for FirstString work.  The computers were protected by each employee's unique login and password.

118.     FirstString's computers are used in or affecting interstate commerce and communication and are therefore "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B).

119.     Ghatnekar intentionally accessed FirstString's computer after FirstString had explicitly withdrawn his authorization and credentials, including on August 30 and 31, 2021.  Such access was therefore without authorization or exceeded Ghatnekar's authorized access.  He deleted, copied, and transferred files from his protected computer after FirstString instructed him that it had revoked his authority to access that computer, that he could "not touch" the computer, and that he must return it to FirstString immediately.

120.    Ghatnekar also intentionally accessed FirstString computers without authorization in September and October 2021 when he directed Cuebas to delete, copy, and transfer documents and files off of her FirstString computer and email account.  At that time, FirstString had withdrawn Ghatnekar's credentials and access rights, and his access was therefore unauthorized.

121.    Ghatnekar acted knowingly and with the intent to defraud FirstString.  He intentionally and wrongfully deleted, copied, and transferred documents and files, and instructed Cuebas to do the same, once FirstString became aware of his breach of contract and fiduciary duties.

122.    In other words, once Ghatnekar realized that FirstString had learned of his misconduct, he tried to cover his tracks by hacking into FirstString's computers and deleting, copying, and transferring relevant evidence.

123.    As a result of Ghatnekar's unauthorized access, he obtained FirstString's files, trade secrets, and other confidential information, all of which have independent value.

124.    As a result of Ghatnekar's unauthorized access, FirstString suffered damages and loss in excess of $5,000, including the costs of investigating and determining which files Ghatnekar deleted, copied, and transferred.

125.    As a direct and proximate result of Ghatnekar's misconduct, FirstString has suffered and will suffer damages in an amount to be proven at trial.

126.    As set out herein, this cause of action is predicated upon Ghatnekar's willful misappropriation of FirstString's corporate assets, Ghatnekar's disclosure of FirstString's confidential information in violation of his fiduciary and contractual obligations, and Ghatnekar's additional willful and deliberate breaches in bad faith of his duties to FirstString.

## COUNT II – DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq.*)
### (Against all Defendants)

127.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

128.     Aspects of FirstString's operations, manufacturing processes, product formulations, product development, sales, marketing, sourcing, and technical know-how, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes constitute protectable trade secrets.

129.     These secret processes and information are not readily ascertainable through proper means.

130.     FirstString had derived actual economic value from these trade secrets and their secrecy, which has put FirstString ahead of its competitors.

131.     FirstString uses these trade secrets to develop its products and business and to seek potential partners, investors, and vendors, in both interstate and international commerce.

132.     FirstString took reasonable steps to protect its trade secrets by instituting confidentiality policies, providing designated, company-owned computers to its employees with which all of their work was to be done, requiring employees agree to non-competition agreements and confidentiality and proprietary information agreements, sharing trade secrets with only a limited, restricted group of leadership executives, and labeling certain documents as proprietary and confidential.

133.     These trade secrets are important to FirstString's business strategy, and if the information and processes or the way in which they were developed, tested, and implemented becomes generally known to FirstString's competitors, FirstString stands to suffer irreparable harm.

134.     McNab, Ghatnekar, and Cuebas have intimate knowledge of FirstString's protectable trade secrets, which allowed Defendants to use and benefit from the significant investment of time and money that FirstString made to develop and protect its trade secret information.

135.     Regranion, McNab, and JT Pharma encouraged Ghatnekar and Cuebas to take and use for their benefit the know-how, processes, and other information that FirstString had developed as trade secrets.  Ghatnekar and Cuebas shared and disclosed FirstString's confidential trade secret

information with Regranion, McNab, and JT Pharma, including by developing the JT-09 Patent Application and commercialization strategies for RGRN-305.

136.    Regranion, McNab, and JT Pharma improperly acquired, disclosed, and used FirstString's trade secrets.  Regranion, McNab, and JT Pharma knew or had reason to know that Ghatnekar and Cuebas had acquired FirstString's trade secrets under a duty to maintain their secrecy and Regranion, McNab, and JT Pharma therefore had acquired FirstString's trade secrets by improper means.

137.    On information and belief, Ghatnekar and Cuebas possess additional confidential and trade secret information that they have shared, planned to share, or inevitably will share with Regranion, McNab, and/or JT Pharma, and/or possess such extensive and detailed knowledge of FirstString's protectable trade secrets that their employment by and/or relationship with Regranion, McNab, and/or JT Pharma in any role that involves products or services that compete with FirstString will necessarily and inevitably result in their disclosure of such confidential and proprietary information.

138.    As a result of the wrongful conduct by which Ghatnekar, Cuebas, Regranion, McNab, and JT Pharma willfully misappropriated and disclosed FirstString's trade secrets, FirstString has been harmed and will continue to be irreparably harmed.

139.    As a result of Defendants' violation of the Defend Trade Secrets Act, FirstString is entitled to an award of actual and punitive damages, as well as an award of damages equal to Defendants' unjust enrichment and/or the imposition of a reasonable royalty as provided under 18 U.S.C. § 1836(b)(3)(B)–(C).

140.    FirstString is also entitled to its reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), as well as injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).

141.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

## COUNT III – SOUTH CAROLINA TRADE SECRETS ACT (S.C. CODE § 39-8-30)
### (Against all Defendants)

142.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

143.    During their employment with FirstString, Ghatnekar and Cuebas had direct and intimate knowledge of FirstString's confidential and proprietary business information and processes for product development, including FirstString's formulas, patterns, compilations, programs, devices, methods, techniques, products, systems, or processes, designs, prototypes, procedures, or codes.  Such information is exclusive to FirstString and is not generally known in the industry.

144.    FirstString's confidential and proprietary information constitutes trade secrets pursuant to the SCTSA. The information derives independent economic value, actual and potential, from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from its disclosure or use.

145.    FirstString made reasonable efforts to maintain the secrecy of its confidential and propriate information, including by having Ghatnekar and Cuebas execute agreements promising to keep FirstString's trade secrets confidential.

146.    Ghatnekar and Cuebas obtained these trade secrets while employed by FirstString, and FirstString communicated its proprietary information to Ghatnekar and Cuebas in confidence. Ghatnekar and Cuebas were under a duty to maintain the secrecy of FirstString's trade secrets, and FirstString did not grant Ghatnekar or Cuebas permission to use or disclose its trade secrets in the course of their work with Regranion, McNab, and JT Pharma, or otherwise.

147.    Regranion, McNab, and JT Pharma knew or should have known that Ghatnekar and Cuebas acquired FirstString's trade secrets in confidence and under a duty to maintain their secrecy.

148.    Defendants have used FirstString's trade secrets to the detriment of FirstString by, among other things, targeting FirstString's actual and potential partners, investors, vendors,

contractors, obtaining grants, misappropriating commercial opportunities, and competing unfairly in the marketplace.

149.    FirstString is entitled to an award of actual and punitive damages incurred as a result of Defendants' wrongful acts, as well as an award of damages equal to their unjust enrichment and/or the imposition of a reasonable royalty as provided for by S.C. Code Ann. § 39-8-40.

150.    FirstString is also entitled to injunctive relief as provided for by S.C. Code Ann. § 39-8-50, its reasonable costs and attorneys' fees as provided for by S.C. Code Ann. § 39-8-80, and such other relief the Court deems just and proper.

151.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

## COUNT IV – BREACH OF CONTRACT
### (Against Ghatnekar)

152.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

153.    The Employment Agreement and Restated Employment Agreement were valid, enforceable, and binding contracts between FirstString and Ghatnekar.

154.    FirstString fully performed all of its obligations pursuant to the Employment Agreement and Restated Employment Agreement, except for those that have been prevented or otherwise excused.

155.    The Employment Agreement and Restated Employment Agreement both provided, among other things, that:

a.    Ghatnekar would "devote [his] full business time, energy and abilities exclusively to the business and interests of" FirstString.

b.    Ghatnekar was prohibited from "render[ing] to others services of any kind for compensation" without FirstString's prior consent.

     c.     Ghatnekar was prohibited from directly or indirectly "solicit[ing]" or "recruit[ing]" employees of FirstString either to work for himself "or for any other person or entity."

156.    Ghatnekar willfully and deliberately breached material aspects the Employment Agreement and Restated Employment Agreement in bad faith by, among other things:

     a.     Devoting substantial business time to Regranion during the hours that he should have been working for FirstString.

     b.     Developing his invention for JT Pharma rather than for FirstString.

     c.     Rendering services for compensation to both Regranion and JT Pharma.

     d.     Soliciting and recruiting FirstString employees, including Cuebas, Scientist A, and Scientist B, to work for Regranion.

     e.     Soliciting Cuebas to work for JT Pharma.

157.    The Employment Agreement and Restated Employment Agreement also bound Ghatnekar to the terms of the Inventions Agreement, pursuant to which he agreed to "promptly disclose in writing" all inventions "made or discovered or conceived or reduced to practice or developed by [Ghatnekar], either alone or jointly with others, during the term" of his employment. (Inventions Agreement, § D.)

158.    Ghatnekar materially breached the Employment Agreement and Restated Employment Agreement by failing to comply with the terms of the Inventions Agreement, in that he did not disclose to FirstString in writing any of the inventions he developed for Regranion and/or JT Pharma during the term of his employment with FirstString.

159.    As a result of Ghatnekar's material breaches of the Employment Agreement and Restated Employment Agreement, FirstString has suffered damages, in an amount to be proved at trial.

160.    As set out herein, this cause of action is predicated upon Ghatnekar's willful misappropriation of FirstString's corporate assets, Ghatnekar's disclosure of FirstString's

confidential information in violation of his fiduciary and contractual obligations, and Ghatnekar's additional willful and deliberate breaches in bad faith of his duties to FirstString.

## COUNT V – BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT
### (Against Ghatnekar)

161.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

162.    Ghatnekar breached the Employment Agreement and Restated Employment Agreement, as set forth above.

163.    Ghatnekar secretly developed products and, among other things, applied for a patent for the benefit of Regranion and JT Pharma while employed by FirstString and bound by the Employment Agreement and Restated Employment Agreement.

164.    Ghatnekar disguised these activities by, among other things, telling the FirstString employees that he directed to work for Regranion to keep such work a secret, instructing them to take Regranion work calls from home, and buying a separate printer for such employees to use while doing Regranion work.

165.    Ghatnekar further disguised his activities on behalf of Regranion by representing to FirstString that the entity he did outside work for was a consulting and development company, rather than a direct competitor.

166.    After FirstString learned of Ghatnekar's side dealing and breach of contract, Ghatnekar lied repeatedly about, among other things, the type of work Regranion did, his role and work at Regranion, and the fact that he solicited and recruited FirstString employees to work for Regranion.

167.    Ghatnekar made these misrepresentations to conceal the fact that he had breached the Employment Agreement by, among other things, working for a direct competitor, recruiting other FirstString employees to work for that competitor, and using FirstString's trade secrets.

168.    As a result of these fraudulent acts accompanying Ghatnekar's breach of contract, FirstString is entitled to an award of damages in an amount to be determined at trial, including punitive damages.

169.    As set out herein, this cause of action is predicated upon Ghatnekar's willful misappropriation of FirstString's corporate assets, Ghatnekar's disclosure of FirstString's confidential information in violation of his fiduciary and contractual obligations, and Ghatnekar's additional willful and deliberate breaches in bad faith of his duties to FirstString.

## COUNT VI – BREACH OF CONTRACT
### (Against McNab)

170.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

171.    The Consulting Agreement was a valid, enforceable, and binding contract between FirstString and McNab.

172.    FirstString fully performed all of its obligations pursuant to the Consulting Agreement, except for those that have been prevented or otherwise excused.

173.    The Consulting Agreement provided, among other things, that:

    a.    McNab would chair the board and identify "partnering/licensing prospects and initiat[e] contact."

    b.    McNab would "hold in confidence and not use or disclose to any third parties" FirstString's Confidential Information.

    c.    McNab would not, "without FirstString's prior written consent, reproduce, disclose or use such Confidential Information at any time, either during or subsequent to [McNab's] engagement by FirstString."

174.    McNab willfully and deliberately breached material aspects of the Consulting Agreement in bad faith by, among other things:

    a.    Directing partnering/licensing contacts to Regranion and JT Pharma instead of FirstString.

    b.    Failing to hold in confidence FirstString's Confidential Information.

      c.    Disclosing to Regranion, JT Pharma, and others FirstString's Confidential Information without obtaining FirstString's prior written consent.

175.    The Consulting Agreement also bound McNab to the terms of the Consultant Inventions Agreement, pursuant to which he agreed to "promptly disclose in writing" all inventions "made or discovered or conceived or reduced to practice or developed by [McNab], either alone or jointly with others, during the term" of his employment. (Consultant Inventions Agreement, § D.)

176.    McNab materially breached the Consulting Agreement by failing to comply with the terms of the Consultant Inventions Agreement, in that he did not disclose to FirstString in writing any of the inventions he developed for Regranion and/or JT Pharma during the term of his employment with FirstString.

177.    As a result of McNab's material breaches of the Consulting Agreement, FirstString has suffered damages, in an amount to be proved at trial.

178.    As set out herein, this cause of action is predicated upon McNab's willful misappropriation of FirstString's corporate assets, McNab's disclosure of FirstString's confidential information in violation of his fiduciary and contractual obligations, and McNab's additional willful and deliberate breaches in bad faith of his duties to FirstString.

### COUNT VII – BREACH OF FIDUCIARY DUTY
**(Against Ghatnekar)**

179.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

180.    As the president and chief scientific officer and later CEO of FirstString, and as a board member of FirstString, Ghatnekar owed FirstString a fiduciary duty of loyalty.

181.    Ghatnekar breached this duty by failing to act exclusively in FirstString's best interests in matters of business. Ghatnekar instead was concerned with developing and conducting business for Regranion and JT Pharma, including the development of products that might compete with FirstString's products, and the pursuit of business and funding.

182.    Ghatnekar further breached his fiduciary duty by failing to present corporate opportunities to FirstString.

183.    Ghatnekar further breached his fiduciary duty by soliciting and recruiting FirstString employees to work for Regranion, causing them to be derelict in their duties to FirstString.

184.    Ghatnekar further breached his fiduciary duty by disclosing FirstString's confidential information to Regranion, JT Pharma, and others.

185.    As a result of Ghatnekar's breaches of his fiduciary duty, FirstString is entitled to an award of damages in an amount to be determined at trial, including but not limited to disgorgement of profits and punitive damages.

186.    As set out herein, this cause of action is predicated upon Ghatnekar's willful misappropriation of FirstString's corporate assets, Ghatnekar's disclosure of FirstString's confidential information in violation of his fiduciary and contractual obligations, and Ghatnekar's additional willful and deliberate breaches in bad faith of his duties to FirstString.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Against McNab)

187.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

188.    As the chairman of FirstString, McNab owed FirstString a fiduciary duty of loyalty.

189.    McNab breached this duty by failing to act exclusively in FirstString's best interests in matters of business.  McNab instead was concerned with developing and conducting business for JT Pharma, including the development of products that might compete with FirstString's products, and the pursuit of business and funding.

190.    McNab further breached his fiduciary duty by failing to present corporate opportunities to FirstString.

191.    McNab further breached his fiduciary duty by disclosing FirstString's confidential information to Regranion, JT Pharma, and others.

192.    As a result of McNab's breaches of his fiduciary duty, FirstString is entitled to an award of damages in an amount to be determined at trial, including but not limited to disgorgement of profits and punitive damages.

193.    As set out herein, this cause of action is predicated upon McNab's willful misappropriation of FirstString's corporate assets, McNab's disclosure of FirstString's confidential information in violation of his fiduciary and contractual obligations, and McNab's additional willful and deliberate breaches in bad faith of his duties to FirstString.

## COUNT IX – BREACH OF FIDUCIARY DUTY
### (Against Cuebas)

194.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

195.    As the Director of Operations at FirstString from 2009 until she left the company in October 2021, Cuebas owed FirstString a fiduciary duty of loyalty.

196.    Cuebas breached her duty by failing to act exclusively in FirstString's best interests in matters of business.  Cuebas instead was concerned with developing and conducting business for Regranion and JT Pharma, including the development of products that might compete with FirstString's products, and the pursuit of business and funding.

197.    Cuebas further breached her fiduciary duty by failing to present corporate opportunities to FirstString.

198.    Cuebas further breached her fiduciary duty by soliciting and recruiting FirstString employees to work for Regranion, causing them to be derelict in their duties to FirstString.

199.    Cuebas further breached her fiduciary duty by deleting relevant documents and information and by taking her FirstString computer upon her resignation, without authorization.

200.    Cuebas further breached her fiduciary duty by disclosing FirstString's confidential information to Regranion, JT Pharma, and others.

201.    As a result of Cuebas' breaches of her fiduciary duty, FirstString is entitled to an award of damages in an amount to be determined at trial, including but not limited to disgorgement of profits and punitive damages

202.    As set out herein, this cause of action is predicated upon Cuebas' willful misappropriation of FirstString's corporate assets, Cuebas' disclosure of FirstString's confidential information in violation of her fiduciary and contractual obligations, and Cuebas' additional willful and deliberate breaches in bad faith of her duties to FirstString.

### COUNT X – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
#### (Against Regranion and JT Pharma)

203.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

204.    Ghatnekar, McNab, and Cuebas breached their fiduciary duties to FirstString, as set forth above.

205.    Regranion and JT Pharma knew that Ghatnekar, McNab, and Cuebas, by virtue of their positions with FirstString, owed FirstString fiduciary duties of loyalty in connection with the exercise of their duties.

206.    Regranion and JT Pharma encouraged and participated in Ghatnekar's, McNab's, and Cuebas' breach of their duties to FirstString and benefited from Ghatnekar's, McNab's, and Cuebas' development of products and pursuit of business and funding.

207.    Regranion and JT Pharma are jointly and severally liable for all damages caused by Ghatnekar's, McNab's, and Cuebas' breaches of their fiduciary duties.

208.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

## COUNT XI – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Regranion, Cuebas, McNab, and JT Pharma)

209.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

210.    Ghatnekar's employment with FirstString was governed by the Employment Agreement, which is a binding and enforceable contract.

211.    Regranion, Cuebas, McNab, and JT Pharma had actual notice of the existence and terms of the Employment Agreement.

212.    Regranion and Cuebas knowingly and willfully interfered with this contractual relationship by employing Ghatnekar in a role similar to that in which he was employed by FirstString and encouraging Ghatnekar to utilize FirstString's confidential and proprietary information and trade secrets for Regranion's and Cuebas' benefit.

213.    Regranion's and Cuebas' interference was intended to, and did, induce Ghatnekar's breach of his continuing contractual obligations to FirstString.

214.    Regranion and Cuebas did not have a legitimate business interest in interfering with Ghatnekar's contractual relationship with FirstString.

215.    McNab and JT Pharma also knowingly and willfully interfered with the contractual relationship between Ghatnekar and FirstString by encouraging Ghatnekar to utilize FirstString's trade secrets for their benefit.

216.    McNab and JT Pharma's interference was intended to, and did, induce Ghatnekar's breach of his continuing contractual obligations to FirstString.

217.    McNab and JT Pharma did not have a legitimate business interest in interfering with Ghatnekar's contractual relationship with FirstString.

218.    Regranion's, Cuebas', McNab's, and JT Pharma's tortious interference caused injury to FirstString including, but not limited to, damage to FirstString's relationships with actual and potential partners, investors, vendors, and other industry contacts, disclosure of FirstString's

confidential and proprietary information and trade secrets, the loss of business, the loss of profits, and the loss of future milestone payments.

219.    As a result of Regranion's, Cuebas', McNab's, and JT Pharma's actions, FirstString is entitled to actual and punitive damages.

220.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

### COUNT XII – TORTIOUS INTERFERENCE WITH CONTRACT
#### (Against Ghatnekar, Regranion, Cuebas, and JT Pharma)

221.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

222.    McNab's employment with FirstString was governed by the Consulting Agreement, which is a binding and enforceable contract.

223.    Ghatnekar, Regranion, Cuebas, and JT Pharma had actual notice of the existence and terms of the Consulting Agreement.

224.    Ghatnekar, Regranion, Cuebas, and JT Pharma knowingly and willfully interfered with the contractual relationship between McNab and FirstString by encouraging McNab to utilize FirstString's trade secrets and direct corporate opportunities away from FirstString for their benefit.

225.    Ghatnekar's, Regranion's, Cuebas', and JT Pharma's interference was intended to, and did, induce McNab's breach of his continuing contractual obligations to FirstString.

226.    Ghatnekar, Regranion, Cuebas, and JT Pharma did not have a legitimate business interest in interfering with McNab's contractual relationship with FirstString.

227.    Ghatnekar's, Regranion's, Cuebas', and JT Pharma's tortious interference caused injury to FirstString including, but not limited to, damage to FirstString's relationships with actual and potential partners, investors, vendors, and other industry contacts, disclosure of FirstString's

confidential and proprietary information and trade secrets, the loss of business, the loss of profits, and the loss of future milestone payments.

228.    As a result of Ghatnekar's, Regranion's, Cuebas', and JT Pharma's actions, FirstString is entitled to actual and punitive damages.

229.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

**COUNT XIII – CIVIL CONSPIRACY**
**(Against Ghatnekar, Cuebas, and McNab)**

230.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

231.    Ghatnekar, Cuebas, and McNab conspired together to accomplish the unlawful purposes, theft of trade secrets, and breaches set forth in this complaint.

232.    Ghatnekar, Cuebas, and McNab agreed to direct corporate opportunities away from FirstString and toward Regranion and agreed to misappropriate FirstString's personnel, resources, facilities, connections, and know-how to advance the Regranion and/or JT Pharma businesses.

233.    Ghatnekar, Cuebas, and McNab also plotted to hide from FirstString the JT-09 Patent Application so that they could develop and sell it to enrich themselves, even though the JT-09 Patent Application was legally FirstString's property.

234.    Ghatnekar, Cuebas, and McNab took affirmative steps to advance their conspiracy.

235.    Ghatnekar, Cuebas, and McNab violated their duties to present corporate opportunities to FirstString.

236.    Ghatnekar and Cuebas recruited FirstString employees to work for Regranion to propel Regranion's business in violation of their duties to FirstString and in violation of Ghatnekar's Employment Agreement prohibiting him from soliciting and recruiting FirstString employees.

237.    Ghatnekar, Cuebas, and McNab also conspired to and did secretly sell the JT-09 Patent Application in violation of Ghatnekar's and Cuebas' duties to FirstString and in violation of Ghatnekar's and McNab's employment agreements.

238.    FirstString suffered injury as a proximate result of these wrongful, conspiratorial acts.

239.    Ghatnekar, Cuebas, and McNab are jointly and severally liable for the harm inflicted on FirstString and should be ordered to pay all actual and consequential damages resulting from their wrongful conduct.

240.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

## COUNT XIV – EQUITABLE FORFEITURE
### (Against Ghatnekar, Cuebas, and McNab)

241.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

242.    As employees of FirstString, Ghatnekar and Cuebas owed a fiduciary duty of loyalty to the company.

243.    As members of the board of directors of FirstString, Ghatnekar and McNab also owed a fiduciary duty of loyalty to the company.

244.    Ghatnekar, Cuebas and McNab breached their fiduciary duties to FirstString, as set forth above.

245.    Ghatnekar, McNab and Cuebas received compensation from FirstString, including wages, benefits, bonuses, and/or equity awards, during the period in which each was engaged in activities constituting a breach of their duty of loyalty to FirstString.

246.    Ghatnekar, McNab and Cuebas' conduct was egregious and pervaded their entire employment relationship with FirstString.

247.    FirstString is therefore entitled to disgorgement of all compensation provided to Ghatnekar, Cuebas, and McNab since they began violating their duties to FirstString.

248.    As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

## COUNT XV – ACCOUNTING
### (Against Ghatnekar, Cuebas, and McNab)

249.    FirstString reiterates and restates the foregoing allegations as if fully set forth herein.

250.    As employees of FirstString, Ghatnekar and Cuebas owed the company fiduciary duties of loyalty.

251.    As members of the board of directors of FirstString, Ghatnekar and McNab also owed fiduciary duties of loyalty to the company.

252.    On information and belief, Ghatnekar, Cuebas, and McNab earned profits from their work for Regranion and JT Pharma, which they obtained in breach of their fiduciary duties to FirstString.

253.    Ghatnekar, Cuebas, and McNab had access to and control over FirstString's assets, including bank accounts, and were obligated to use those assets solely for FirstString's benefit.

254.    On information and belief, Ghatnekar, Cuebas, and McNab commingled FirstString's funds with Regranion's and JT Pharma's and used FirstString's assets to benefit themselves and Regranion.

255.    FirstString is entitled to an accounting of Ghatnekar's, Cuebas', and McNab's assets, to identify all funds that rightfully belong to FirstString.

256.    FirstString lacks an adequate remedy at law, because Ghatnekar, Cuebas, and McNab are in possession of the information needed to determine the scope of their misconduct,

which cannot be known without performing an accounting of Ghatnekar's, Cuebas', and McNab's assets.

257.     As set out herein, this cause of action is predicated upon Defendants' willful misappropriation of FirstString's corporate assets, Defendants' disclosure of FirstString's confidential information in violation of their fiduciary and contractual obligations, and Defendants' additional willful and deliberate breaches in bad faith of their duties to FirstString.

## PRAYER FOR RELIEF

WHEREFORE, FirstString prays for judgment against Defendants providing FirstString the following relief:

A.     An order enjoining Defendants from disseminating, using, relying upon, or otherwise profiting from misappropriated FirstString trade secrets, inventions, or other property.

B.     An order requiring Defendants to return to FirstString all misappropriated trade secrets, inventions, or other property.

C.     An order requiring Defendants to assign to FirstString all property of any sort directly or indirectly derived from or incorporating any trade secrets, inventions, or other property misappropriated from FirstString.

D.     A constructive trust over any business, proceeds, or other property that Defendants obtained, generated, or created based directly or indirectly on misappropriated FirstString trade secrets, inventions, or other property.

E.     An award of money damages, including all damages provided by applicable statute, along with all interest, costs, and attorneys' fees recoverable by law, in an amount to be determined at trial.

F.     Disgorgement of all compensation, revenues, or other benefits that Defendants received as a result of their wrongful conduct.

G.       Punitive and exemplary damages.

H.       Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims so triable.

Respectfully submitted,


By:      s/ Brian C. Duffy
         Brian C. Duffy, Esq. (Fed. ID No. 9491)
         Matthew R. Hubbell, Esq. (Fed. ID No. 5484)
         Patrick C. Wooten, Esq. (Fed. ID No.10399)
         Robert L. Wehrman, Esq. (Fed. ID No. 13426)
         DUFFY & YOUNG, LLC
         96 Broad Street
         Charleston, SC 29401
         bduffy@duffyandyoung.com
         mhubbell@duffyandyoung.com
         pwooten@duffyandyoung.com
         rwehrman@duffyandyoung.com

         J. Noah Hagey*
         Jonathan G. Kortmansky*
         Christman Rice*
         Tracy Zinsou*
         BRAUNHAGEY & BORDEN LLP
         7 Times Square, 27th Floor
         New York, NY 10036
         Tel: (646) 853-5200
         hagey@braunhagey.com
         kortmansky@braunhagey.com
         rice@braunhagey.com
         zinsou@braunhagey.com

         *Attorneys for FirstString Research, LLC*

         * *Pro hac vice* applications forthcoming

Charleston, South Carolina
November 2, 2021

42