UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| FirstString Research, Inc., | Civil Action No.: 2:21-cv-03619-BHH |
| *Plaintiff,* | |
| v. | |
| Regranion, LLC; JT Pharmaceuticals, Inc.; Dr. Gautam Ghatnekar; James McNab; and Stefanie Cuebas, | **ANSWER, AFFIFMANTIVE DEFENSES, COUNTERCLAIMS AND THIRD PARTY COMPLAINT OF DEFENDANTS REGRANION, LLC AND GAUTAM GHATNEKAR** |
| *Defendants,* | |
| and | |
| Dr. Gautam Ghatnekar, Regranion, LLC; | |
| *Counterclaimants, Third Party Plaintiffs,* | |
| v. | |
| FirstString Research, Inc.; and | |
| *Counterclaim Defendant,* | |
| Neal McConnell, | |
| *Third-Party Defendant.* | |

Defendants, Regranion LLC ("Regranion") and Dr. Gautam Ghatnekar ("Ghatnekar"),

answer Plaintiff's Complaint and assert their counterclaims and third-party complaint as follows:

**FIRST DEFENSE**

1.      They admit only so much of Paragraph 1 as may be construed to allege that Plaintiff

is a Mt. Pleasant-based biotechnology company directed to injury response and injury induced

inflammatory response therapies that seeks in its Complaint equitable relief and damages,

1

entitlement to which is denied.  They deny the remaining allegations of Paragraph 1.

2.    In response to Paragraph 2, they admit only that Regranion and JT Pharmaceuticals, Inc. ("JT Pharma") were in business while Ghatnekar was FirstString's CEO.  They deny the remaining allegations of Paragraph 2.

3.    They deny any wrongdoing alleged or referenced in Paragraph 3 and therefore deny the allegations of Paragraph 3.

4.    In response to Paragraph 4, they admit only that Ghatnekar assigned his rights to an invention unrelated to Plaintiff or its technology to JT Pharma and that certain grant applications associated with Regranion or JT Pharma listed FirstString's address on the applications in light of the subleases between Plaintiff and Regranion and between Plaintiff and JT Pharma. They deny the remaining allegations of Paragraph 4.

5.    They admit only so much of Paragraph 5 as may be construed to allege that certain FirstString employees performed services for Regranion and JT Pharma and that Ghatnekar asked such employees not to discuss Regranion with other FirstString employees to ensure that the other FirstString employees did not feel excluded and to protect Regranion's confidential information. They deny the remaining allegations of Paragraph 5.

6.    In response to Paragraph 6, they lack knowledge or information sufficient to form a belief as to the total value of Ghatnekar's and McNab's cash and equity compensation and therefore deny same.  They deny the remaining allegations of Paragraph 6.

7.    They admit only so much of Paragraph 7 as may be construed to allege that FirstString does not generate revenue from the sale of products but, instead, relies on money from investors and from grant funding.  They lack knowledge or information sufficient to form a belief as to the truth of the subject of investor's trust and confidence and therefore deny same.  They

deny the remaining allegations of Paragraph 7.

8.    They admit only to much of Paragraph 8 as may be construed to allege that Regranion and JT Pharma paid Ghatnekar and that the amounts of such payments were not disclosed to FirstString.  They deny the remaining allegations of Paragraph 8 and specifically deny the characterization of Ghatnekar's employment agreement.

9.    In response to Paragraph 9, they admit only that Ghatnekar, upon receiving authorization from FirstString's chairman of the board, Tony Bartsh, removed non-FirstString information from his FirstString computer and removed FirstString's information from a new Apple computer he purchased and "synched" to his FirstString computer to more quickly return the FirstString computer.  They further admit that Ghatnekar has not given FirstString his personal cellular telephone, which is not a FirstString device.  Upon information and belief, the forensic images of the FirstString computer and the personal computer, which are in Plaintiff's control, reflect Ghatnekar's good-faith attempt to return FirstString's information to FirstString and, if such images were correctly prepared, captured all data on both devices, including deleted data.  They deny the remaining allegations of Paragraph 9.

10.    In response to Paragraph 10, they admit only that FirstString seeks equitable relief and damages in this lawsuit, entitlement to which is denied.  They deny the remaining allegations of Paragraph 10.

11.    They admit the allegations of Paragraph 11.

12.    In response to Paragraph 12, they admit that Regranion is a South Carolina limited liability company with its principal place of business in Charleston County that is a clinical stage pharmaceutical company.  Further responding, Regranion is a single-member limited liability company owned and controlled by Ghatnekar and has a license to a certain technology directed to

autoimmune skin diseases, which is completely different from FirstString's peptide-based technology used for wound healing and injury response; and in no way competitive with FirstString's technology or its indications.   They further admit Paragraph 12 to the extent it alleges that Ghatnekar was listed as Chairman of Regranion on FirstString's website and on certain grant applications submitted by FirstString. They deny the allegations of Paragraph 12 to the extent that they are inconsistent with the foregoing.

13.     They admit the allegations of Paragraph 13, upon information and belief.

14.     In response to Paragraph 14, they deny that Ghatnekar is a board member of JT Pharma and deny that cause existed to fire Ghatnekar but admit the remaining allegations.

15.     They admit the allegations of Paragraph 15, upon information and belief.

16.     In response to Paragraph 16, they admit the first sentence.  They deny the remaining allegations of Paragraph 16 as stated and would show that Defendant Cuebas was an Executive Assistant of FirstString from 2009 through about June of 2018.

17.     In response to Paragraph 17, they admit that this Court has subject matter jurisdiction over Plaintiff's claims.

18.     In response to Paragraph 18, they admit that this Court has personal jurisdiction over them.

19.     In response to Paragraph 19, they admit that venue is proper in this District and Division.

20.     They admit the allegations of Paragraph 20.

21.     They deny the allegations of Paragraph 21 as stated but would show that FirstString develops a wound-healing drug.

22.     In response to Paragraph 22, they admit that Ghatnekar had certain obligations to

FirstString and, for the contractual obligations, crave reference to the contracts that are the source of such obligations, which contracts should be referred to for their contents to the extent that there is a meeting of the minds on the terms of such contracts.  They deny the allegations of Paragraph 22 to the extent that they allege contractual obligations that are inconsistent with, or in addition to, the obligations contained within the enforceable provisions of such contracts and specifically deny that Ghatnekar was contractually obligated to assign inventions to FirstString that are unrelated to FirstString.

23.     They admit only so much of Paragraph 23 as alleges that FirstString has raised approximately $67 million from investors and that Ghatnekar was compliant with his contractual commitments to FirstString.  They deny the remaining allegations of Paragraph 23.

24.     They admit only so much of Paragraph 24 as may be construed to allege that certain FirstString employees performed services for JT Pharma and Regranion and that JT Pharma and Regranion had subleases with FirstString for FirstString's office space.  They deny the remaining allegations of Paragraph 24.

25.     In response to Paragraph 25, they admit that Regranion has a license to a certain autoimmune skin disease response drug, but would show that the drug was not a corporate opportunity of FirstString and is no way competitive with FirstString's business or technology. They further admit that a patent application was submitted by JT Pharma, but would show that this invention was not related to FirstString and that Ghatnekar was not obligated to assign this invention to FirstString.  They deny the allegations of Paragraph 25 to the extent that they are inconsistent with, or in addition to, the admissions contained herein.

26.     In response to Paragraph 26, they admit Regranion and JT Pharma pursued research grants to fund the research of those businesses and that Ghatnekar and McNab received

compensation as a result of their efforts.  They deny the remaining allegations of Paragraph 26.

27.    In response to Paragraph 27, they deny that FirstString first learned of Regranion in August of 2021, as Ghatnekar's work for Regranion was on FirstString's website, on his bio which was circulated, on his LinkedIn profile and otherwise provided to FirstString, its shareholders,  and its board.  They deny the remaining allegations of Paragraph 27.

28.    In response to Paragraph 28, they admit, upon information and belief, that McNab was chairman of FirstString's board and received certain compensation for his efforts.  The remaining allegations of Paragraph 28 reference an agreement, which speaks for itself and should be referred to for its contents.  They deny the remaining allegations of Paragraph 28 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein.

29.    Paragraph 29 references a written agreement, which should be referred to for its contents.  They deny the allegations of Paragraph 29 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein.

30.    Paragraph 30 references a written agreement, which should be referred to for its contents.  They deny the allegations of Paragraph 30 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein.

31.    Paragraph 31 references a written agreement, which should be referred to for its contents.  They deny the allegations of Paragraph 31 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein.

32.    Paragraph 32 references a written agreement, which should be referred to for its contents.  They deny the allegations of Paragraph 32 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein.

33.    In response to Paragraph 33, they admit that Ghatnekar served as FirstString's Chief

Science Officer until he was appointed CEO in 2009 and that he executed an employment agreement in connection with such employment.  They further admit that Ghatnekar signed a new employment agreement on or about January 1, 2010 and an Amended and Restated Employment agreement on or about October 1, 2017 and that Defendant McNab signed such Agreements.  They deny the allegations of Paragraph 33 to the extent that they are inconsistent with, or in addition to, these admissions.

34.     Paragraph 34 references written agreements, which should be referred to for their contents.  They deny the allegations of Paragraph 34 to the extent that they are inconsistent with, or in addition to, the agreements referenced therein and would further show that the cited portions of such agreements exclude material limitations to Ghatnekar's obligations under such Agreements.

35.     In response to Paragraph 35, they admit only that paragraph 7 of that certain Amended and Restated Employment Agreement dated October 1, 2017, states that Ghatnekar agrees to be bound by FirstString's standard Proprietary Information and Inventions Agreement, which should be referred to for its contents if it exists.  They deny the allegations of Paragraph 35 to the extent that they are inconsistent with, or in addition to, the agreements referenced therein and specifically deny Paragraph 35 to the extent that it can be construed to allege that Ghatnekar breached any enforceable contractual obligation owed to Plaintiff.  They specifically deny that the Employment Agreement includes the definition of Proprietary Information referenced in Paragraph 35.

36.     They deny the allegations of Paragraph 36.

37.     They deny the allegations of Paragraph 37.

38.     They deny the allegations of Paragraph 38.

39.     In response to Paragraph 39, they deny that FirstString's board was not informed of Ghatnekar's involvement with Regranion, deny that FirstString's alleged trade secrets, inventions and other property were misappropriated and deny the existence of conflicted transactions and dealings.  They deny the allegations of Paragraph 39 to the extent that they are inconsistent with the foregoing.

40.     They deny the allegations of Paragraph 40.

41.     They deny the allegations of Paragraph 41.

42.     They deny the allegations of Paragraph 42.

43.     In response to Paragraph 43, they admit that FirstString's products do not generate revenue and admit that FirstString relies on grants and investments to finance development work. Further responding, they admit that certain disclosures were made in connection with certain fundraising and deny Paragraph 43 to the extent that it alleges they breached any obligations to FirstString or its investors.  They deny any additional allegations of Paragraph 43.

44.     Paragraph 44 references a written agreement, which should be referred to for its contents. They deny the allegations of Paragraph 44 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein and specifically deny that Ghatnekar breached any obligations thereunder.

45.     Paragraph 45 references a written agreement, which should be referred to for its contents. They deny the allegations of Paragraph 45 to the extent that they are inconsistent with, or in addition to, the agreement referenced therein and specifically deny that Ghatnekar breached any obligations thereunder.

46.     Paragraph 46 references a written agreement, which should be referred to for its contents.  They deny the allegations of Paragraph 46 to the extent that they are inconsistent with,

or in addition to, the agreement referenced therein and specifically deny that Ghatnekar breached any obligations thereunder.

47.    They deny the allegations of Paragraph 47.

48.    In response to Paragraph 48, they admit only that FirstString has raised approximately $67 million from investors and that Ghatnekar and McNab were provided cash compensation by FirstString, as approved by FirstString's board and/or compensation committee. They lack knowledge or information sufficient to form a belief as to the present value of equity awards and therefore deny the allegations of Paragraph 48 related to such values. They deny the remaining allegations of Paragraph 48.

49.    They deny the allegations of Paragraph 49.

50.    They deny the allegations of Paragraph 50.

51.    In response to Paragraph 51, they admit the first sentence. They lack knowledge or information sufficient to form a belief as to the truth of the second sentence and therefore deny same. They lack knowledge or information sufficient to form a belief as to whether McNab informed FirstString of JT Pharma and therefore deny same. They deny the remaining allegations of Paragraph 51 and further allege that Regranion was never hidden from FirstString and would show that Regranion was presented to FirstString and its board on multiple occasions.

52.    In response to Paragraph 52, they deny that FirstString employees were secretly solicited and recruited to work for Regranion or JT Pharma while they were supposed to be working for FirstString. Further responding, Paragraph 52 is a mischaracterization of Ghatnekar's instruction to certain FirstString employees to keep other employees from feeling excluded and to protect information confidential to Regranion. They deny the remaining allegations of Paragraph 52.

53.     In response to Paragraph 53, they admit only that Cuebas began performing administrative functions for Regranion in or around 2011.  They deny the remaining allegations of Paragraph 53.

54.     In response to Paragraph 54, they admit only that Cuebas began performing administrative work for JT Pharma in or about 2014.  They deny the remaining allegations of Paragraph 54.

55.     They deny the allegations of Paragraph 55.

56.     They admit only so much of Paragraph 56 as may be construed to allege that a FirstString employee began performing certain services for Regranion beginning in or around 2015, but denies that her title was Senior Director of R&D at that time.  Further responding, they admit that this person's work on behalf of Regranion included certain work focused on development and commercialization but deny that Scientist A was ever directed to rely on FirstString's connections, know-how, processes or procedures. They deny the remaining allegations of Paragraph 56.

57.     In response to Paragraph 57, they deny that Scientist B was recruited by Ghatnekar and would show that Scientist B approached Ghatnekar because she wanted to work for Regranion to help earn extra money to purchase a home.  They deny the remaining allegations of Paragraph 57.

58.     In response to Paragraph 58, they deny the existence of an employment agreement and therefore deny Paragraph 58 and would show that Scientist B executed a confidentiality agreement to protect Regranion's confidential information.

59.     They deny Paragraph 59 to the extent that it can be construed to allege that Ghatnekar directed Scientist B to work for Regranion and would show that Scientist B began

working for Regranion after she asked to participate.  Further responding, they admit that Scientist B was involved with Regranion's business discussions and that Scientist B worked on Regranion projects, including potential business transactions.   They deny the remaining allegations of Paragraph 59.

60.     In response to Paragraph 60, they deny that Ghatnekar told Scientist A, Scientist B and Cuebas to keep Regranion on the "down low" but asked that Regranion not be discussed with other FirstString employees to ensure that other FirstString employees did not feel excluded and to protect Regranion's confidential information.  Further responding, they admit that a printer was available for Regranion work but deny the remaining allegations of Paragraph 60.

61.     In response to Paragraph 61, they admit only that Ghatnekar told Scientist A and Scientist B that FirstString work should "come first" and be prioritized over any work for Regranion and that work for Regranion should be done if and when they had down time. They deny the remaining allegations of Paragraph 61.

62.     They deny the allegations of Paragraph 62.

63.     They deny the allegations of Paragraph 63.

64.     In response to Paragraph 64, they deny that Regranion licensed the rights to RGRN-305 in or around 2014 and would show that the license agreement occurred later.  Further responding, they deny the allegations of Paragraph 64 to the extent that they could be construed to allege that RGRN-305 was a corporate opportunity of FirstString.

65.     The allegations of Paragraph 65 are legal conclusions to which no response is required.  To the extent that a response is required, they admit that McNab and Ghatnekar owed the duties to FirstString that are imposed by law but deny that such duties were breached.

66.     In response to Paragraph 66, they deny that RGRN-305 was a corporate opportunity

available to FirstString and would show that Ghatnekar attempted to negotiate a license with Curis on behalf of FirstString, but Curis was unwilling to license the molecule to FirstString. Further responding, over 2 years after Curis declared RGRN-305 unavailable to FirstString did Regranion enter into a license agreement for RGRN-305. As a result, they deny that any duties were ignored or that any opportunities were hidden and therefore deny the allegations of Paragraph 66 to the extent that they are inconsistent with the foregoing.

67.    They admit only so much of Paragraph 67 as alleges that RGRN-305 is being pursued as a potential treatment of autoimmune skin conditions, which is a completely different technology from the peptide pursued by FirstString that does not treat the same conditions and is therefore not competitive with FirstString. Further responding, they admit that Regranion's payment obligation is tied to development efforts. They deny the remaining allegations of Paragraph 67.

68.    In response to Paragraph 68, they admit only that RGRN-305 is intended for autoimmune skin conditions that are not competitive with FirstString. They deny the remaining allegations of Paragraph 68.

69.    Responding to Paragraph 69, they admit only that Scientist A and Scientist B performed certain services directed towards RGRN-305 for Regranion's benefit, including work with potential partners, but deny the remaining allegations of Paragraph 69.

70.    Responding to the allegations of Paragraph 70, they admit only that Scientist B requested to attend the stated one day only summit on behalf of Regranion, which eventually led to term sheet discussions with one company that was tentatively agreed upon. They deny the remaining allegations of Paragraph 70.

71.    They deny the allegations of Paragraph 71 as stated and would show that Scientist

B requested to attend the stated summit from home.

72.    They deny the allegations of Paragraph 72 as stated.

73.    They deny the allegations of Paragraph 73.

74.    They deny the allegations of Paragraph 74 and would show that the invention claimed in the referenced patent application is not based on FirstString's alleged trade secrets, the existence of which is denied, or confidential information.

75.    They admit only so much of Paragraph 75 as may be construed to allege that the referenced patent application is not the property of FirstString and was applied for by JT Pharma, which, upon information and belief, was entitled to use the referenced address as a result of a sublease agreement with FirstString.  They deny that Ghatnekar was obligated to disclose the application to FirstString and deny the allegations of Paragraph 75 to the extent that they are inconsistent with, or in addition to, the foregoing admission.

76.    Responding to Paragraph 76, they admit that the title is accurate but otherwise deny the allegations of Paragraph 76. They further crave reference to the patent application, a document that speaks for itself and should be referred to for its contents.

77.    They deny the allegations of Paragraph 77.

78.    They deny that Ghatnekar was obligated to disclose the application to FirstString and otherwise deny the allegations of Paragraph 78.

79.    They lack knowledge or information sufficient to form a belief as to the truth of the terms of a sale of the patent application and therefore deny same.  They deny the remaining allegations of Paragraph 79 as stated and would show that, on information and belief, JT Pharma, as the assignee, has the exclusive right to sell the referenced application.

80.    They deny the allegations of Paragraph 80.

81.     They lack knowledge or information sufficient to form a belief as to the truth of Paragraph 81 and therefore deny same.

82.     They deny the allegations of Paragraph 82.

83.     They deny the allegations of Paragraph 83.

84.     Responding to Paragraph 84, they admit only that Regranion and JT Pharma have received grant funding but deny that the funding is the product of improper use of FirstString's employees or resources and therefore deny the remaining allegations of Paragraph 84.

85.     Responding to Paragraph 85, they crave reference to the grant applications, which speak for themselves.  They deny the allegations of Paragraph 85 to the extent that they are inconsistent with the grant applications.

86.     Responding to Paragraph 86, they admit only that Ghatnekar did not disclose the applications or funding but would show that he was not obligated to do so. They deny the allegations of Paragraph 86 to the extent that they are in inconsistent with, or in addition to, the foregoing admission.

87.     Responding to Paragraph 87, they admit only that Regranion paid McNab and that JT Pharma paid Ghatnekar, but none of the payments were for the amount alleged in Paragraph 87.

88.     Responding to Paragraph 88, they deny that McNab secretly orchestrated the alleged merger transaction and would show that it was openly discussed, including with FirstString board chair Tony Bartsh and board members Neal McConnell and David Leffell.

89.     They admit only so much of Paragraph 89 as alleges that McNab created an audio recording regarding the proposed transaction in which Ghatnekar expressed support for further exploration and, upon information and belief, sent the recording to Titan.

90.     Responding to the allegations of Paragraph 90, they admit that McNab resigned and admit that Ghatnekar was not asked to resign.  Further responding, they deny Paragraph 90 to the extent that it alleges that Ghatnekar knew a recording was being created to send to Titan to promote the transaction and otherwise deny the allegations of Paragraph 90.

91.     Upon information and belief, they deny the allegations of Paragraph 91.

92.     In response to Paragraph 92, they admit only that Defendant Cuebas performed certain administrative services for JT Pharma and crave reference to the referenced grant applications and documents cited therein, which speak for themselves and should be referred to for their contents.  They deny the remaining allegations of Paragraph 92.

93.     They deny that McNab or Ghatnekar stole or misappropriated FirstString's alleged trade secrets, the existence of which is denied, or property and therefore deny the allegations of Paragraph 93.

94.     They deny the allegations of Paragraph 94 to the extent they relate to them.  They deny the remaining allegations of Paragraph 94 based upon lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

95.     Responding to the allegations of Paragraph 95, they admit only that Ghatnekar called Neal McConnell from a phone number that Ghatnekar has had for fifteen years.  They deny the remaining allegations of Paragraph 95 based upon lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

96.     They admit only so much of Paragraph 96 as alleges that Ghatnekar had conversations with Tony Bartsh, Neal McConnell and FirstString's counsel in which he stated that clinical development work for RGRN-305 was primarily undertaken in Denmark and that no other FirstString employees owned Regranion.  They deny the remaining allegations of Paragraph 96.

97.     Responding to Paragraph 97, they admit only that Ghatnekar told Bartsh and McConnell that he owns Regranion, and that it was created in 2007.  They deny the allegations of Paragraph 97 to the extent that they allege that Ghatnekar did not attempt to bring the RGRN-305 to FirstString and would show that RGRN-305 was licensed to Regranion over 2 years after it was clear that Curis would not license RGRN-305 to FirstString.  They deny that FirstString did not know of Regranion and deny the allegations of Paragraph 97 that are inconsistent with, or in addition to, the foregoing.

98.     They deny the allegations of Paragraph 98 and would show that Scientist A's name was on the application because she wanted to work on it.

99.     Responding to Paragraph 99, they deny that Ghatnekar stated that he had not done work for Regranion since January of 2018, deny that Ghatnekar recruited Scientist B and therefore deny the remaining allegations of Paragraph 99.

100.    They admit the allegations of Paragraph 100.

101.    The allegations of Paragraph 101 relate to a writing, which should be referred to for its contents.  They deny the allegations of Paragraph 101 to the extent that they are inconsistent with, or in addition to, the writing referenced in Paragraph 101.  Further responding, they would show that, during a telephone call between Ghatnekar, Bartsh, Neal McConnell, Grant Carwile, and counsel for FirstString, Andrea Marshall, Bartsh authorized Ghatnekar to remove his personal data from the FirstString laptop and stated that removing the information was fine because FirstString was going to forensically investigate the laptop anyway.. They deny the remaining allegations of Paragraph 101.

102.    They admit the allegations of Paragraph 102 and would further show that Tony Bartsh threatened Ghatnekar and stated that he was going to get back his $20 million investment

from FirstString and take Regranion for himself, at which point Ghatnekar believed FirstString was being unreasonable. Further responding, they would show, upon information and belief, that Bartsh instructed Steve Speer, a FirstString investor and board observer, to call Ghatnekar to encourage him to concede wrongdoing without seeking counsel or "things would get really bad" for Ghatnekar.

103.    The allegations of Paragraph 103 relate to a writing, which speaks for itself and should be referred to for its contents. They deny the allegations of Paragraph 103 to the extent that they are inconsistent with the writing referenced therein.

104.    The allegations of Paragraph 104 relate to a writing, which speaks for itself and should be referred to for its contents. They deny the allegations of Paragraph 104 to the extent that they are inconsistent with the writing referenced therein.

105.    Responding to the allegations of Paragraph 105, they admit that FirstString's counsel made the alleged statements, or certain of them, in a writing, which should be referred to for its contents, but deny that Ghatnekar intentionally destroyed evidence and metadata and deny any destruction of evidence. Further responding, they would show that, upon information and belief, the forensic images created by FirstString should capture any deleted documentation.

106.    Responding to the allegations of Paragraph 106, they admit that Ghatnekar was fired purportedly for cause on September 1, 2021 but deny that Ghatnekar breached any enforceable provisions of the referenced agreements and deny that cause existed to terminate him.

107.    They admit the allegations of Paragraph 107.

108.    The allegations of Paragraph 108 refer to a writing, which speaks for itself and should be referred to for its contents. They deny the allegations of Paragraph 108 to the extent that they are inconsistent with, or in addition to, the referenced writing.

109.    The allegations of Paragraph 109 refer to a writing, which speaks for itself and should be referred to for its contents.  They deny the allegations of Paragraph 109 to the extent that they are inconsistent with, or in addition to, the writing referenced therein.  Further responding, they admit that Kevin Bittorf performed services for FirstString after he performed services for Regranion but deny that Ghatnekar stated that he did not have an interest in any patents through Regranion but did state that none of his inventions were in Regranion.  They deny the allegations of Paragraph 109 not specifically admitted.

110.    They admit only so much of Paragraph 110 as may be construed to allege that FirstSting filed multiple grant applications under Ghatnekar's forged signature and listed Ghatnekar as the principal investigator and that, upon information and belief, such filing was at the express instruction of Dr. David Leffell, FirstString's Chief Medical Officer and Board Member.  They further admit that, without Ghatnekar's authorization, such grant applications were filed under Ghatnekar's personal eRA Commons account.  They deny the allegations of Paragraph 110 to the extent that they are inconsistent with the foregoing.

111.    They admit only so much of Paragraph 111 as may be construed to allege that Ghatnekar subsequently learned of the forged grant applications and associated cover letters by accessing his personal eRA Commons account, which FirstString has no authority to access after his termination and which FirstString cannot access any longer.  They deny the allegations of Paragraph 111 to the extent that they are inconsistent with the foregoing.

112.    On information and belief, they admit only so much of Paragraph 112 as may be construed to allege that Defendant Cuebas resigned on or about October 8, 2021 after working a two-week notice.  They lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 112 and therefore deny same.

113.    They deny the allegations of Paragraph 113.

114.    They deny the allegations of Paragraph 114.

115.    They deny the allegations of Paragraph 115.

116.    In response to Paragraph 116, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

117.    They admit only so much of Paragraph 117 as may be construed to allege that Ghatnekar and Cuebas had FirstString computers that were protected by login and passwords. They deny the remaining allegations of Paragraph 117.

118.    They deny the allegations of Paragraph 118 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

119.    They deny the allegations of Paragraph 119.

120.    They deny the allegations of Paragraph 120.

121.    They deny the allegations of Paragraph 121.

122.    They deny the allegations of Paragraph 122.

123.    They deny the allegations of Paragraph 123.

124.    They deny the allegations of Paragraph 124.

125.    They deny the allegations of Paragraph 125.

126.    They deny that Ghatnekar's actions constitute willful and deliberate misconduct, or misconduct of any nature, and therefore deny the allegations of Paragraph 126.

127.    In response to Paragraph 127, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

128.    They deny the allegations of Paragraph 128 and demand strict proof thereof.

129.    They deny the allegations of Paragraph 129.

130.    They deny the allegations of Paragraph 130.

131.    They deny the allegations of Paragraph 131.

132.    They deny the allegations of Paragraph 132.

133.    They deny the allegations of Paragraph 133.

134.    They deny the allegations of Paragraph 134.

135.    They deny the allegations of Paragraph 135.

136.    They deny the allegations of Paragraph 136.

137.    They deny the allegations of Paragraph 137.

138.    They deny the allegations of Paragraph 138.

139.    They deny the allegations of Paragraph 139.

140.    They deny the allegations of Paragraph 140.

141.    They deny the allegations of Paragraph 141.

142.    In response to Paragraph 142, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

143.    Responding to the allegations of Paragraph 143, they admit only that Ghatnekar had knowledge of FirstString's information but deny the existence of FirstString's alleged trade secrets and deny the allegations of Paragraph 143 to the extent that they are inconsistent with the foregoing.

144.    They deny the allegations of Paragraph 144.

145.    They admit only so much of Paragraph 145 as alleges that Ghatnekar and, upon information and belief, Cuebas signed certain agreements with FirstString. They deny the remaining allegations of Paragraph 145.

146.    They deny the allegations of Paragraph 146.

147.    They deny the allegations of Paragraph 147.

148.    They deny the allegations of Paragraph 148.

149.    They deny the allegations of Paragraph 149.

150.    They deny the allegations of Paragraph 150.

151.    They deny the allegations of Paragraph 151.

152.    In response to Paragraph 152, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

153.    In response to Paragraph 153, they admit only that Ghatnekar executed the referenced agreements but deny that the enforceable provisions of such agreements were breached by Ghatnekar.

154.    They deny the allegations of Paragraph 154.

155.    The allegations of Paragraph 155 reference agreements that speak for themselves and that should be referred to for their specific content.  They deny the allegations of Paragraph 155 to the extent that they are inconsistent with, in addition to, or leave out additional details from the referenced agreements.

156.    They deny the allegations of Paragraph 156.

157.    They deny the allegations of Paragraph 157.

158.    They deny the allegations of Paragraph 158.

159.    They deny the allegations of Paragraph 159.

160.    They deny the allegations of Paragraph 160.

161.    In response to Paragraph 161, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

162.    They deny the allegations of Paragraph 162.

163.    They admit only so much of Paragraph 163 as alleges that JT Pharma applied for a patent on which Ghatnekar was listed as an inventor.  They deny the remaining allegations of Paragraph 163 and would show that RGRN-305 was invented by a third party.

164.    They admit only so much of Paragraph 164 as alleges that a separate printer was used for printing non-FirstString documents.  They deny the remaining allegations of Paragraph 164.

165.    They deny the allegations of Paragraph 165 and would show that Regranion is in no way competitive with FirstString.

166.    They deny the allegations of Paragraph 166.

167.    They deny the allegations of Paragraph 167.

168.    They deny the allegations of Paragraph 168.

169.    They deny the allegations of Paragraph 169.

170.    In response to Paragraph 170, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

171.    They deny the allegations of Paragraph 171 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

172.    They deny the allegations of Paragraph 172 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

173.    They deny the allegations of Paragraph 173 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

174.    They deny the allegations of Paragraph 174 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

175.    They deny the allegations of Paragraph 175 based upon lack of sufficient

knowledge or information upon which to form a belief as to the truth of such allegations.

176.    They deny the allegations of Paragraph 176 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

177.    They deny the allegations of Paragraph 177 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

178.    They deny the allegations of Paragraph 178 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

179.    In response to Paragraph 179, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

180.    The allegations of Paragraph 180 consist of legal conclusions for which no response is required.  To the extent that a response is required, they admit only that Ghatnekar owes the fiduciary duties provided under applicable law.

181.    They deny the allegations of Paragraph 181.

182.    They deny the allegations of Paragraph 182.

183.    They deny the allegations of Paragraph 183.

184.    They deny the allegations of Paragraph 184.

185.    They deny the allegations of Paragraph 185.

186.    They deny the allegations of Paragraph 186.

187.    In response to Paragraph 187, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

188.    They deny the allegations of Paragraph 188 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

189.    They deny the allegations of Paragraph 189 based upon lack of sufficient

knowledge or information upon which to form a belief as to the truth of such allegations.

190.     They deny the allegations of Paragraph 190 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

191.     They deny the allegations of Paragraph 191 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

192.     They deny the allegations of Paragraph 192 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

193.     They deny the allegations of Paragraph 193 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

194.     In response to Paragraph 194, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

195.     They deny the allegations of Paragraph 195 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

196.     They deny the allegations of Paragraph 196 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

197.     They deny the allegations of Paragraph 197 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

198.     They deny the allegations of Paragraph 198 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

199.     They deny the allegations of Paragraph 199 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

200.     They deny the allegations of Paragraph 200 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

201.    They deny the allegations of Paragraph 201 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

202.    They deny the allegations of Paragraph 202 based upon lack of sufficient knowledge or information upon which to form a belief as to the truth of such allegations.

203.    In response to Paragraph 203, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

204.    They deny the allegations of Paragraph 204.

205.    They deny the allegations of Paragraph 205 to the extent that they are alleged against Regranion.   The remaining allegations are denied based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

206.    They deny the allegations of Paragraph 206 as may be construed to relate to Regranion except that they admit that Regranion benefitted from certain services rendered by Ghatnekar, McNab and Cuebas.  They deny the allegations of Paragraph 206 to the extent that they relate to JT Pharma based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

207.    They deny the allegations of Paragraph 207.

208.    They deny the allegations of Paragraph 208.

209.    In response to Paragraph 209, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

210.    They admit only so much of Paragraph 210 as alleges that Ghatnekar and FirstString entered into the employment agreement.  They deny the allegations of Paragraph 210 to the extent that they are inconsistent with, or in addition to, the foregoing admission.

211.    Responding to the Paragraph 211, the allegations directed towards Regranion

constitute legal conclusions for which no response is required.  To the extent that a response is required, they deny the allegations to the extent that they are inconsistent with applicable law on actual notice.  Further responding, they deny the allegations directed towards Cuebas, McNab and JT Pharma based upon lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

212.    They deny the allegations of Paragraph 212.

213.    They deny the allegations of Paragraph 213.

214.    They deny that Regranion and Cuebas interfered with Ghatnekar's contractual relationship with FirstString and therefore deny the allegations of Paragraph 214.

215.    They deny the allegations of Paragraph 215.

216.    They deny the allegations of Paragraph 216.

217.    They deny the allegations of Paragraph 217.

218.    They deny the allegations of Paragraph 218 and would show, upon information and belief, that Bartsh sent a letter after Ghatnekar's termination to FirstString shareholders, not including Ghatnekar, in which he stated that FirstString's prospects have never been better.

219.    They deny the allegations of Paragraph 219.

220.    They deny the allegations of Paragraph 220.

221.    In response to Paragraph 221, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

222.    They lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 222 and therefore deny same.

223.    They deny the allegations of Paragraph 223 to the extent that they relate to Ghatnekar and Regranion.  They deny the remaining allegations of Paragraph 223 based upon lack

of knowledge or information sufficient to form a belief as to the truth of said allegations.

224.    They deny the allegations of Paragraph 224 to the extent that they relate to Regranion or Ghatnekar.  They deny the remaining allegations of Paragraph 224 to the extent that they relate to other Defendants based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

225.    They deny the allegations of Paragraph 225 to the extent that they relate to Regranion or Ghatnekar.  They deny the remaining allegations of Paragraph 225 to the extent that they relate to the other Defendants based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

226.    In response to Paragraph 226, they deny the allegations to the extent that they relate to Regranion or Ghatnekar.  The deny the remaining allegations of Paragraph 226 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

227.    In response to Paragraph 227, they deny the allegations to the extent that they relate to Ghatnekar or Regranion.  They deny the remaining allegations of Paragraph 227 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

228.    They deny the allegations of Paragraph 228 to the extent that they relate to Ghatnekar or Regranion.  They deny the remaining allegations of Paragraph 228 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

229.    They deny the allegations of Paragraph 229.

230.    In response to Paragraph 230, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

231.    They deny the allegations of Paragraph 231.

232.    They deny the allegations of Paragraph 232.

233.     They deny the allegations of Paragraph 233.

234.     They deny the allegations of Paragraph 234.

235.     They deny the allegations of Paragraph 235.

236.     They admit only so much of Paragraph 236 as alleges that Cuebas, Scientist A and Scientist B performed certain services for Regranion and were instructed never to let work for Regranion interfere with work for FirstString.  They deny the remaining allegations of Paragraph 236.

237.     They deny the allegations of Paragraph 237.

238.     They deny the allegations of Paragraph 238.

239.     They deny the allegations of Paragraph 239.

240.     They deny the allegations of Paragraph 240.

241.     In response to Paragraph 241, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

242.     In response to the allegations of Paragraph 242, they admit only that Ghatnekar owed the duties imposed upon them by law and deny the allegations of Paragraph 242 to the extent that they are inconsistent with, or in addition to, applicable law.

243.     In response to the allegations of Paragraph 243, they admit only that Ghatnekar and McNab owed the duties imposed upon them by law and deny the allegations of Paragraph 243 to the extent that they are inconsistent with, or in addition to, applicable law.

244.     They deny the allegations of Paragraph 244 to the extent that they are directed at Ghatnekar.  They deny the remaining allegations of Paragraph 244 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

245.     Responding to the allegations of Paragraph 245, they admit only that Ghatnakar

and, upon information and belief, Cuebas and McNab received certain payments, wages and/or benefits during a period of time from FirstString.  They deny the remaining allegations directed towards Ghatnekar and they deny the remaining allegations based upon lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

246.    They deny Paragraph 246 to the extent that it is directed towards Ghatnekar.  They deny the remaining allegations based upon lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

247.    They deny the allegations of Paragraph 247 to the extent that they are directed towards Ghatnekar. They deny the remaining allegations of Paragraph 247 based upon lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

248.    They deny the allegations of Paragraph 248.

249.    In response to Paragraph 249, they reaffirm and reallege the contents of the preceding paragraphs together as fully as if set forth again verbatim.

250.    In response to the allegations of Paragraph 250, they admit only that Ghatnekar and Cuebas owed the duties imposed upon them by law and deny the allegations of Paragraph 250 to the extent that they are inconsistent with, or in addition to, applicable law.

251.    In response to the allegations of Paragraph 251, they admit only that Ghatnekar and McNab owed the duties imposed upon them by law and deny the allegations of Paragraph 251 to the extent that they are inconsistent with, or in addition to, applicable law.

252.    They deny the allegations of Paragraph 252 to the extent that they are directed towards Ghatnekar.  They deny the remaining allegations of Paragraph 252 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

253.    In response to Paragraph 253, they admit only that Ghatnekar had access to

FirstString's bank accounts but deny that Ghatnekar used such bank accounts for an improper purpose. The remaining allegations are denied based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

254. They deny the allegations of Paragraph 254 to the extent that they are directed towards Ghatnekar. They deny the remaining allegations of Paragraph 254 based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

255. They deny the allegations of Paragraph 255 to the extent that they are directed towards Ghatnekar. They deny the remaining allegations based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

256. They deny the allegations of Paragraph 256 to the extent they are directed towards Ghatnekar. They deny the remaining allegations based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

257. They deny the allegations of Paragraph 257.

258. They deny that Plaintiff is entitled to the relief sought in its unnumbered WHEREFORE paragraph, including all relief sought in subparts A through H.

259. They deny each and every allegation of Plaintiff's Complaint not specifically admitted herein. To the extent that the allegations relate to other Defendants' knowledge or acts that are not specifically admitted, they are denied based on lack of knowledge or information sufficient to form a belief as to the truth of such allegations.

## SECOND DEFENSE

260. One or more of Plaintiff's claims fail to state a claim upon which relief can be granted against Ghatnekar and/or Regranion and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### THIRD DEFENSE

261.    Plaintiff failed to mitigate, limit or prevent the damages alleged in the Complaint, which limits or prevents Plaintiff's recovery.

### FOURTH DEFENSE

262.    Plaintiff's claim for damages is subject to the South Carolina Noneconomic Damage Awards Act of 2005, SC Code. § 15-32-200 et seq., including the protections against punitive damages provided in §§ 15-32-520 & -530.

### FIFTH DEFENSE

263.    Plaintiff's recovery against Regranion and/or Ghatnekar is prohibited and/or limited by the protections of SC Code § 15-38-15.

### SIXTH DEFENSE

264.    Plaintiff's claims for relief are barred, in whole or in part, by the equitable doctrines of laches, acquiescence, unclean hands, estoppel and/or waiver.

### SEVENTH DEFENSE

265.    Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations or statute of repose.

### EIGHTH DEFENSE

266.    Plaintiff's claims are limited by the equitable doctrine of unjust enrichment.

### NINTH DEFENSE

267.    Plaintiff's claims based on agreements entered between the parties are limited to the extent there is no meeting of the minds on all or part of such agreements and/or to the extent the provisions of such agreements are unenforceable under applicable law.

### TENTH DEFENSE

268.     Plaintiff's recovery is barred, in whole or in part, because agreements between FirstString and Ghatnekar do not include the Immunity from Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing provision of the Defend Trade Secrets Act.

## ELEVENTH DEFENSE

269.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff has ratified, condoned or acquiesced to the alleged acts or omissions of Defendant Ghatnekar.

## TWELFTH DEFENSE

270.     Plaintiff's claims should be dismissed in favor of arbitration in light of arbitration agreement.

## THIRTEENTH DEFENSE

271.     To the extent Plaintiff seeks punitive or exemplary damages, such claims violate this Defendant's rights to substantive due process as provided in the Fifth and Fourteenth Amendments of the United States Constitution and the Constitution of the State of South Carolina so as to preclude or limit recovery from these Defendants.

**WHEREFORE**, Defendants seek judgment in their favor and against Plaintiff and for such other relief as this Court deems just and proper.

## COUNTERCLAIMS AND THIRD PARTY CLAIM

Defendants, Regranion, LLC ("Regranion") and Dr. Gautam Ghatnekar ("Ghatnekar"), by and through their undersigned attorneys, for their counterclaims against Plaintiff FirstString Research, Inc. and third-party complaint against third-party defendant Neal McConnell ("McConnell"), allege as follows:

## NATURE OF THE CASE

272.    Defendant Ghatnekar brings the following counterclaims and third party claim that arise from the sequence of events associated with the termination of his employment by Plaintiff FirstString.

273.    Specifically, FirstString has been on a mission to destroy Ghatnekar and "take Regranion" after asserting, with no foundation, that Ghatnekar stole money from FirstString, which FirstString knew or should have known was false and which, on information and belief, was demonstrated to be false after FirstSting conducted an investigation that included hiring Quick Group, LLC.  Thereafter, FirstString pivoted its justification for termination to unidentified "trade secrets" that Ghatnekar somehow misappropriated and alleged breaches of fiduciary duty and usurping of corporate opportunities through Regranion.  However, the true reason for Ghatnekar's termination was an attempt to "take Regranion" and to avoid paying Ghatnekar millions under his Employment Agreement, including a severance and then-owed grant bonuses, while continuing to use his name and reputation to pursue millions of dollars in federal grant money for its business without paying Ghatnekar the grant bonus to which he would be entitled if still employed.  FirstString set out to further harm Ghatnekar by trying to "keep Regranion from doing business" by withholding non-FirstString Information, which was provided to FirstString in confidence, and by sending inappropriate preservation letters to Regranion's business contacts, all while telling Ghatnekar to hand over Regranion and admit wrongdoing without seeking counsel or things would "get really bad" for him.

## PARTIES

274.    Dr. Gautam Ghatnekar is an individual residing in Charleston County, South Carolina.

275.    Regranion is a South Carolina limited liability company.

33

276.    FirstString Research, Inc. ("FirstString") is a Delaware corporation having its principal place of business in Charleston County, South Carolina.

277.    Third Party Defendant Neal McConnell ("McConnell") is an individual residing in Charleston County, South Carolina.  McConnell is a partner in Sophos Capital Management and Blue Sparrow Partners and is now the CEO of FirstString.

## JURISDICTION AND VENUE

278.    The Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. § 1367 because they are so related to FirstString's claims that form part of the same case or controversy.

279.    This Court has personal jurisdiction over FirstString because FirstString's principal place of business is in Charleston County, South Carolina.  This Court has personal jurisdiction over McConnell because he is a resident of Charleston County, South Carolina and transacts business in Charleston County, South Carolina.  All actions alleged herein took place in Charleston County, South Carolina.

280.    Venue is proper in the United States District Court for the District of South Carolina because FirstString and McConnell reside in South Carolina and because the most substantial part of the alleged acts or omissions giving rise to the causes of action herein occurred in Charleston County.

## FACTS

281.    Ghatnekar founded FirstString in 2005 to pursue technology that he co-invented.  FirstString is a biopharmaceutical company that primarily develops therapies for injury-based medical conditions.  FirstString is headquartered in Mt. Pleasant, South Carolina. Since its inception, Ghatnekar poured substantially all of his time, heart and soul into

FirstString to take it from a laboratory discovery to a company that has a current valuation of approximately $120 million. From the time Ghatnekar founded FirstString until the time that his employment there was terminated, Ghatnekar put FirstString above everything else, sacrificing other opportunities, time with his family, personal vacations, and other endeavors.

282.    Ghatnekar served as the President and Chief Executive Officer of FirstString from 2009 until September 2021. He previously served as President and Chief Scientific Officer/Chief Operating Officer from 2005-2008. Ghatnekar currently has an equity position in FirstString.

283.    Ghatnekar's employment is governed by that certain Amended and Restated Employment Agreement, dated October 1, 2017, a copy of which is attached hereto as **Exhibit A**.

284.    In Section 2(a), the Employment Agreement outlines Ghatnekar's compensation as President and CEO. Further, in Section 2(b), the Employment Agreement provides that Ghatnekar will receive certain performance bonuses, and in Section 2(b)(ii), the Employment Agreement provides for a "Grant Bonus" upon the funding of a "Grant" as follows:

> (ii)    Upon the funding of each grant or research & development contract awarded to the Company by any government agency (each a "Grant"), [Ghatnekar] will be eligible to receive a bonus in an amount equal to eight percent (8%) of the actual funded amount received for the applicable Grant (each a "Grant Bonus"). The payment of each Grant Bonus will be made within sixty (60) days following receipt of the funded amounts of the applicable Grant.

285.    As shown above, FirstString's obligation to pay the Grant Bonus is binding once a Grant is funded. The awarded (funded) Grant funds are kept within the funding government agency until the funds are withdrawn by the grantee at certain intervals or stages

of completion because it is not allowed or advisable to request payment of all of the funds upfront.

286.     Grants are funded and awarded when a Grant application is approved for funding by the relevant federal agency. For a grant from the federal government, a Grant is funded/awarded when the Notice of Award is issued.  For a research and development contract, a Grant is funded/awarded when the contract is signed by the funding party. Thereafter, payments towards the applicable Grant are made upon request by the grantee and/or the achievement of certain milestones or requirements set forth in the applicable grant application.

287.     As a result, the Employment Agreement obligates FirstString to pay the Grant Bonus for all grant applications that were funded during the term of Ghatnekar's employment. This is supported by the course of conduct of the parties.

288.     Further, the Grant Bonus is not to be paid from the funds available from the Grant.  Instead, the Grant Bonus is to be paid from FirstString's cash on hand, which further supports paying the Grant Bonus when the Grants are awarded/funded.

289.     There are at least three funded Grants (the "Funded Grants") having a total funded amount of over eight million three hundred thousand dollars ($8,300,000) which were funded during Ghatnekar's FirstString employment for which the Grant Bonus has not been paid to Ghatnekar.  The Funded Grants have been presented to the FirstString board, such as in one or more presentations made to the board including on or about August 20, 2021.

290.     The Grant Bonus is to be paid within sixty (60) days following "receipt of the funded amounts" for each Grant.  "Receipt" of the funded amounts occurs when the Grants become funded, meaning the funding request has been approved.  The course of dealing between FirstString and Ghatnekar reflects this definition of "receipt" of the funded amounts.

Alternatively, "receipt" of the funded amounts occurs when a Notice of Award or a signed contract from the funding agency is received by FirstString.

291.    Under the Employment Agreement, Ghatnekar is owed the Grant Bonus for all funded amounts under the Funded Grants.

292.    FirstString refuses to pay Ghatnekar the Grant Bonus he is owed under the Funded Grants.

293.    As shown below, section 3(b) of the Employment Agreement provides that Ghatnekar will receive certain benefits upon the termination of his employment, including the payment of a severance and other benefits (the "Post-Termination Benefits"), in the event that Ghatnekar was terminated without "Cause", as defined by section 3(c) below:

> (b)    In the event Executive's employment with the Company is terminated by the Company without Cause (as defined below) or, in the event Executive terminates his employment with the Company for Good Reason (as defined below), in each case, Executive will be entitled to (i) receive a lump sum payment equal to Executive's then effective Base Salary rate for two (2) years; a (ii) a lump sum Performance Bonus payment equal the average of the Performance Bonuses paid to Executive during the previous two (2) years; (iii) acceleration of vesting of such number of Stock Incentive Awards as would have vested in the three (3) year period following the Termination Date; and (iv) the right to exercise all Executive's vested but unexercised stock options in such amounts and at such times as the Executive may determine during the period commencing with the Termination Date and ending on the fifth (5th) anniversary of the Termination Date, but in no event later than the latest date any such stock option would have expired by its original terms. Each lump sum payment will be paid as soon as the Executive's execution of a release and waiver is effective, but no later than 60 days following the Termination Date and, if the 60-day period ends in a calendar year after the calendar year of the Termination Date, payment will not be made until the calendar year in which the 60-day period ends. In each case, the receipt of such termination benefits shall be contingent upon Executive's execution of a release and waiver of claims in a form acceptable to the Company.

> (c)    "Cause" means (i) any material violation by Executive of any law or regulation applicable to the Company and/or the business of the Company; (ii) Executive's indictment or conviction for, or plea of guilty or no contest to, any felony or any other crime involving moral turpitude or dishonesty, (iii) commission or furtherance of a fraud or act of dishonesty against the Company, (iv) Executive's

refusal to perform his job duties to the satisfaction of the Board, (v) Executive's gross negligence or willful misconduct in the performance of Executive's duties as a senior executive of the Company, (vi) repeated abuse of alcohol or use of a controlled substance, or (vii) a material breach of this Agreement or any other agreement between Executive and the Company, including but not limited to a proprietary information and invention assignment agreement and/or confidentiality agreement.

294.    FirstString had no basis to terminate Ghatnekar for Cause, so FirstString is obligated to provide Ghatnekar with the Post-Termination Benefits provided for in the Employment Agreement.

295.    By its terms in Paragraph 9(e), the Employment Agreement constitutes "the entire and only agreement and understanding between the parties" governing Ghatnekar's employment and "supersedes and cancels any and all previous contracts, arrangements or understandings" regarding Ghatnekar's employment.

296.    Further, Paragraph 7 of the Employment Agreement provides that Ghatnekar agrees to be bound by FirstString's "standard Proprietary Information and Inventions Agreement."  However, FirstString does not have a "standard" Proprietary Information and Inventions Agreement.  Instead, FirstString, at the time, had a "Consultant" Proprietary Information and Inventions Agreement, which is for independent contractors.  FirstString believes that the "Consultant" Proprietary Information and Inventions Agreement applies to the Employment Agreement.  For example, the Consultant Proprietary Information and Inventions Agreement is quoted in FirstString's Complaint as applicable to the Employment Agreement.  Further, FirstString filed the Consultant Proprietary Information and Inventions Agreement in its response to a motion for temporary injunctive relief filed in conjunction with a lawsuit filed by Ghatnekar and Regranion captioned *Dr. Gautam Ghatnekar and Regranion, LLC v. FirstString Research, Inc. and Tony Bartsh*, C/A No. 2021-CP-1004689, currently

pending in the South Carolina Court of Common Pleas in Charleston County, SC and filed on October 11, 2021 (the "State Action") and swore, under penalty of perjury, that the Consultant Proprietary Information and Inventions Agreement applied to the Employment Agreement. (attached hereto as **Exhibit B**, *see* Exhibit F of same).

297.    FirstString, at the time, also had an "Employee" Proprietary Information and Inventions Agreement for employees that have supervisors, unlike Ghatnekar.   Because FirstString had no "standard" Proprietary Information and Inventions Agreement, Ghatnekar and FirstString had no meeting of the minds on which of the referenced agreements applied to the Employment Agreement.   Accordingly, neither of the agreements apply to the Employment Agreement.

298.    Sections 3.4 and 3.5 of the Employee Proprietary Information and Inventions Agreement provide:

> 3.4    I will promptly disclose in writing to my immediate supervisor or to any persons designated by the Company, all "Inventions" (which term includes improvements, inventions (whether or not patentable), works of authorship, trade secrets, technology, algorithms, computer software, protocols, formulas, compositions, ideas, designs, processes, techniques, know-how and data) made or conceived or reduced to practice or developed by me (in whole or in part, either alone or jointly with others) during the term of my employment… (remainder omitted).

> 3.5    I agree that all Inventions that I make, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my employment shall be the sole property of the Company.  The Company shall be the sole owner of all Rights in connection therewith.

299.    Assuming the Employee Proprietary Information and Inventions Agreement is part of the Employment Agreement, which is denied, the agreement to assign "Inventions" to FirstString is unenforceable as overbroad because it does not exclude inventions made during employment that are unrelated to employment.   Further, the agreement does not express a

present intention to assign the "Inventions," as required to actually assign intellectual property rights.

300.     Further, the provision requiring the disclosure of "Inventions" is overbroad and therefore unenforceable because FirstString has no legitimate basis to require Ghatnekar to disclose "Inventions" that are completely unrelated to his work for FirstString.  Further still, Ghatnekar, as CEO, did not have an "immediate supervisor" such that he could disclose such Inventions, and FirstString never identified another person for such disclosure.

301.     Further, Section 3.9 of the Employee Proprietary Information and Inventions Agreement (in the event that it applies to the Employment Agreement, which is denied) provides an employee with an opportunity to identify "Inventions" that are not subject to the Employee Proprietary Information and Inventions Agreement.  Ghatnekar was never presented with the Employee Proprietary Information and Inventions Agreement, so he never had the opportunity to exclude "Inventions" that do not apply to FirstString.  As a result, Dr, Ghatnekar's "Inventions" that are unrelated to FirstString do not need to be identified to FirstString, whether conceived before the Employment Agreement or after.

302.     Section 6 of the Employment Agreement further provides that Ghatnekar is entitled to the same indemnification as the Company provides to its other officers.   Article VIII, Section 1 of FirstString's Bylaws provides that FirstString shall indemnify its directors, officers, employees and agents to the fullest extent permitted by Section 145 of the General Corporate Law of the State of Delaware. Under the Employment Agreement and FirstString's Bylaws, Ghatnekar is entitled to indemnification for the claims asserted against him in this lawsuit.

303.    FirstString was wildly successful during Ghatnekar's tenure as President and CEO. By way of example, the Company received four rounds of multimillion-dollar investment and approximately $35 million in federal grant funding in the last several years. FirstString was granted over 15 US patents and 40 international patents on Ghatnekar's inventions.  Ghatnekar oversaw the expansion of FirstString's product portfolio from one product to at least four different drug products and over a dozen therapeutic indications.

304.    The Company's Board of Directors routinely awarded performance bonuses to Ghatnekar for his great work on the Company's behalf. For instance, in early 2021, he received a $200,000 bonus approved by the Board for successfully navigating the Company through the COVID-19 pandemic.

305.    Merely days before his abrupt termination, he was awarded 400,000 new stock options unanimously by the board of directors for good work performed.

306.    In late August of 2021, Tony Bartsh ("Bartsh"), FirstString's Board Chairman, accused Ghatnekar of breaching his fiduciary and contractual duties to the Company.  Bartsh further stated that he was going to withdraw his money from FirstString and take Regranion from Ghatnekar.  These allegations came out of nowhere, and Ghatnekar believed they were the result of a misunderstanding or lack of information.

307.    The allegations concerned Ghatnekar's ownership and operation of Regranion, a separate company that Ghatnekar had been operating since 2007 alongside his work at FirstString, a fact well known by FirstString and its employees, approved by its then-current Executive Chairman, and touted by FirstString in Ghatnekar's bio on its website since at least 2012. Regranion was started as a consulting company that Ghatnekar operated in his spare time.

41

308. Regranion does not, and never has, pursued any corporate opportunities that were available to FirstString. Regranion is not competitive with FirstString.

309. During the course of Ghatnekar's employment for FirstString, FirstString always took priority over Regranion, which is evidenced by the success of FirstString and the time Ghatnekar devoted to FirstString. Ghatnekar never allowed Regranion to interfere with his duties to FirstString.

310. Ghatnekar's relationship with Regranion was not a secret to anyone, including the management of FirstString. In fact, it was marketed to the public on FirstString's website on Ghatnekar's bio, which was prepared by FirstString (but not by Ghatnekar).

**Gautam Ghatnekar, PhD**
*President and CEO*

Dr. Ghatnekar is President and CEO of FirstString Research, a clinical-stage biopharmaceutical company dedicated to delivering breakthrough solutions for inflammation and injury based medical conditions through a better understanding of the molecular and cellular contexts that define the underlying pathology. FirstString is focused on diseases associated with dysregulation of inflammatory processes and modulation of injury response, such as cutaneous radiation injury, radiation dermatitis, and wounds. FirstString's technology is based on connexin-based peptides (α-Connexin Carboxyl-Terminal or aCT peptides) that exert profound healing effects on diseased and damaged tissue. Under Dr. Ghatnekar's leadership, FirstString Research has developed a robust product pipeline and is advancing the clinical development of its lead dermatology product, Granexin® gel. Granexin® has been tested in multiple successful clinical trials and is currently in late-stage trials for cutaneous radiation injury and cutaneous scarring.

Dr. Ghatnekar is well published and has multiple US and International patents to his name. He serves on NIH study sections, and is PI or Co-PI on multiple NIH and DoD grants/contracts. Over the last decade, Dr. Ghatnekar has raised significant capital for research and development via institutional investors, angel funds, and federal and state grant/contracts.

Dr. Ghatnekar earned a Ph.D. in 2004 from North Carolina State University in Comparative Biomedical Science with an emphasis on cellular and developmental toxicology. Dr. Ghatnekar was a post-doctoral fellow at the Medical University of South Carolina where he studied regenerative medicine and discovered the translational benefits of aCT peptides, which led to the formation of FirstString Research. Prior to becoming President and CEO of FirstString, Dr. Ghatnekar served as the Company's Chief Scientific Officer. He currently serves as Chairman of Regranion, on the board of directors of the South Carolina Student Loan Corporation, and the Medical Technology Enterprise Consortium (MTEC).

311. Further, Ghatnekar's relationship with Regranion was provided to FirstString board members on numerous occasions, including when his bio was provided to shareholders in connection with annual shareholder meetings. Additionally, on information and belief, due diligence associated with investments into FirstString further disclosed Regranion to investors. Further still, Ghatnekar's relationship with Regranion was included on grant applications submitted to the federal government by or on behalf of FirstString.

312.    FirstString's board knew that Ghatnekar was involved in other endeavors, and even requested to do so by FirstString's board.  For example, it was well known that Ghatnekar evaluated grant applications on behalf of NIH.    Further, McConnell asked Ghatnekar to evaluate investments for Blue Sparrow and/or Sophos.  In fact, just days before his termination and during the time that Ghatnekar was discussing Regranion with McConnell and Bartsh, McConnell, after stating "I know this sounds hypocritical", asked Ghatnekar to spend substantial time reviewing and discussing a potential investment opportunity into Rafael Holdings, Inc. for one of his private equity firms, Blue Sparrow.  Such endeavors are not discouraged but permitted, so long as they do not "materially interfere" with Ghatnekar's duties under this Employment Agreement, and they never did, as shown by FirstString's success.

313.    Ghatnekar, upon the Board Chairman's approval, hired certain FirstString employees to provide work for Regranion on an as-needed basis.  Further, Regranion hired Dr. Carissa James, an employee of FirstString, upon Ms. James's request to perform work for Regranion.  FirstString employees were instructed to always put FirstString first and to work for Regranion only when there was nothing to do for FirstString, such as after hours and on the weekends.  These employees did not, and Ghatnekar never would have allowed them to, terminate their employment with FirstString as a result of doing work for Regranion.

314.    The Company's Board Chair at that time, Jim McNab, approved and sanctioned Ghatnekar's work for Regranion. In fact, Mr. McNab himself entered into a consulting agreement with, and performed work for, Regranion.

315.    Regranion is in no way competitive with FirstString, and Ghatnekar always devoted his time and attention to his duties as President and CEO of FirstString, as FirstString's success during his tenure would suggest.

316.    Regranion is primarily a consulting company that assists third parties, like Defendant JT Pharma, with the preparation of grant applications and the administration of the research and development under such grants.  The research and development is typically conducted by third parties hired by Regranion.

317.    Additionally, Regranion has a license from Curis, Inc. to commercialize a patented molecule (not invented by Regranion or Ghatnekar) called RGRN-305, formerly known as Debio 0932.  Regranion is seeking to commercialize RGRN-305 as a treatment for psoriasis and potentially other autoimmune conditions, which is not competitive with FirstString.

318.    These potential uses for RGRN-305 are not trade secrets because, among other things, the treatment of psoriasis using RGRN-305 is the subject of a 2014 publication entitled "Debio 0932, A New Oral Hsp90 Inhibitor, Alleviates Psoriasis in a Xenograft Transplantation Model" (attached hereto as **Exhibit C**).

319.    FirstString was aware of Regranion's pursuit of RGRN-305, such as by the knowledge of Defendant McNab and, upon information and belief, Mark Rubin, both of whom were board members of FirstString.

320.    In response to Bartsh's allegations in late August of 2021, Ghatnekar met with the Board and fully briefed them on Regranion and its business activities. In response, Bartsh demanded that Ghatnekar provide complete, unfettered access to Regranion's confidential and proprietary business information, financial records, corporate documentation, and contracts.

321.    Bartsh threated Ghatnekar by stating that he would take Regranion and its business assets away from him if he did not comply.  Bartsh also threatened to pull "his money" out of FirstString.

322.    Ghatnekar responded to the Board via a letter dated August 27, 2021, in which he once again clearly explained his Regranion business activities. In an effort to work with the Board, he even offered to provide FirstString with the requested Regranion information.

323.    The Board, acting through Tony Bartsh, ignored Ghatnekar's offer to work with FirstString in good faith to help the board understand the relationship, instead continuing to make threats and impose arbitrary deadlines.

324.    On September 1, 2021, Ghatnekar found out that he was fired through an email message to his counsel from FirstString's counsel. The message said that the Board decided to fire him and that he would receive further notices.

325.    Until the filing of the present lawsuit, he has not received any further notices that clarify the basis for his termination.

326.    Ghatnekar, per normal Company payroll procedures, should have received his final paycheck on September 30, 2021, but the final paycheck did not include all of the compensation, accrued but unused vacation time, grant bonuses and other benefits that he is owed per his employment agreement. Further, FirstString was obligated to provide Ghatnekar with the Post-Termination Benefits no later than 60 days following the termination date, but FirstString has not provided the Post-Termination Benefits to Ghatnekar.

327.    Since Ghatnekar was fired, FirstString has been on a mission to destroy his reputation and career while continuing to improperly use Ghatnekar's name and reputation for FirstString's benefit.

***The Defamatory Statement Regarding Alleged Theft of Company Resources***

328.    On or about Friday, September 3, 2021, McConnell informed certain FirstString employees and board members, including but not limited to, Tony Bartsh, Grant Carwile, Dr. David Leffell, Andrea Marshall, Dr. Christina Grek, Dr. Carissa James, Stefanie Cuebas, Dr. Travis McQuiston and Susanne Haugebak, that Ghatnekar was fired for improperly using FirstString's resources. The implication was clear – McConnell accused Ghatnekar of stealing FirstString's money.  Prior to making this statement, Bartsh told the employees that "we gave our lawyers what we wanted to say today, they completely neutered it but we decided we are going to say it anyway."  In response to this defamatory statement, Defendant Cuebas asked McConnell to clarify what he meant by "resources", and McConnell refused to provide such clarification.  Mr. Connell's false statement, made *after* Ghatnekar's termination, was not made for any proper purpose and was therefore not the subject of any privilege.

329.    In response to this statement, FirstString's in-house counsel, Andrea Marshall, reviewed FirstString's financial records to determine whether Ghatnekar stole or otherwise improperly used any of FirstString's money. The week after Mr. McConnell accused Ghatnekar of stealing FirstString's resources, Andrea Marshall was able to confirm to Mr. Bartsh and Mr. McConnell as well as FirstString employees that no money appeared to be missing or stolen from FirstString's bank accounts, which looked normal. To date, McConnell has not corrected this false, misleading, and damaging statement.

330.    Instead of correcting his false statement regarding Ghatnekar, FirstString doubled down on its efforts to discover some type of financial fraud that would justify the poor decision to terminate Ghatnekar.  FirstString hired Chris Quick, a private investigator of Quick

Group, LLC, to find evidence that Ghatnekar stole FirstString's money. Upon information and belief, communications between FirstString and Chris Quick reflect that Quick was hired because FirstString, or its board members, felt FirstString had to find financial fraud to justify Ghatnekar's termination.

331.    Upon information and belief, McConnell made other defamatory statements regarding Ghatnekar, including telling Jamie McNab, the son of Defendant McNab, that Ghatnekar stole money and was a "con man" during a golf trip in Sea Island, Georgia. Further, upon information and belief, McConnell told Defendant McNab that Ghatnekar stole money. Ghatnekar reserves the right to seek discovery on the existence of additional defamatory statements and to amend his claims upon discovering additional defamatory statements made by or on behalf of McConnell or any other agent of FirstString.

### The Improper Data Preservation Letters

332.    After Ghatnekar was terminated, FirstString conducted an investigation of Ghatnekar for the stated purpose of determining whether he actually did anything improper. Upon information and belief, the actual purpose of the investigation was two-prong: (i) to find a basis to terminate Ghatnekar so that FirstString could avoid providing the Post-Termination Benefits when FirstString realized Ghatnekar did not steal money from FirstString; and (2) to harm Ghatnekar by harming Regranion. Upon information and belief, FirstString used this "investigation" to discover the identity of Regranion's business contacts by asking FirstString employees who had done work for Regranion for the identity of Regranion's business contacts.

333.    Thereafter, FirstString sent data preservation letters to one or more of Regranion's business contacts informing them of a dispute between FirstString and Ghatnekar and asking them to preserve all relevant data related to their business with Regranion.

334.    The actual purpose of the preservation letters was to interfere with Regranion's potential contractual relations by implying that Ghatnekar had engaged in misconduct.  The recipients of these letters do not have any FirstString information or any other material that is relevant to the dispute, or that could lead to the discovery of information that is relevant to the dispute, between the parties.  FirstString served the preservation letters for the improper purpose of harming Ghatnekar and/or Regranion by preventing Regranion from consummating a contract with Regranion's prospective business clients or by otherwise attempting to harm Regranion's business.

335.    The improper purpose of the preservation letters was established during a meeting on September 24, 2021 between Ghatnekar, McConnell and Defendant McNab.  During the meeting, McConnell, who was visibly angry, told Ghatnekar that the purpose of the preservation letters was to ensure that "Regranion could not conduct any further business."

336.    As a result of the improper preservation letters, Regranion has lost at least one prospective business opportunity worth a substantial amount of money.

### *The Federal Grants and Grant Applications*

337.    Much of FirstString's operating budget for research and development is funded by federal grant applications.  The primary sources of this grant funding are the National Institutes of Health ("NIH"), the Department of Defense ("DOD"), and The Biomedical Advanced Research and Development Authority ("BARDA").  Currently, FirstString is conducting research and development under several Funded Grants.  Upon information and belief, Ghatnekar is named as the principal investigator, the person in charge of the research and development, on these Funded Grants.  Because Ghatnekar is no longer associated with the Funded Grants or the research and development efforts thereunder, NIH's, DOD's, and/or

BARDA's grant rules provide that, in some instances, the granting party (NIH, DOD, or BARDA) should be notified of this change immediately. However, upon information and belief, FirstString did not notify NIH, DOD, or BARDA of the change or the sponsor's representative on all Funded Grants and continued to seek federal funds using Ghatnekar's name and reputation until Ghatnekar filed the State Action.

338.    For example, upon information and belief, after Ghatnekar's termination, FirstString was required to revise a clinical protocol for a study that is the subject of a DOD Funded Grant. Because the protocol involves the experimental treatment of a development pharmaceutical on human test subjects, the revised protocol must be approved by the U.S. Food and Drug Administration ("FDA"). Upon information and belief, when the revised protocol was submitted to the FDA, Ghatnekar was identified as the sponsor's representative in the protocol, suggesting that Ghatnekar was still overseeing the clinical protocol or otherwise associated with it.

339.    Further, upon information and belief, at some point after Ghatnekar's termination from FirstString, with direct instruction from Dr. David Leffell, (FirstSting's Chief Medical Officer/Advisor, Member of FirstString's Board of Directors, Member of FirstString's Medical Advisory Board, and chief of dermatologic surgery and cutaneous oncology at the Yale School of Medicine), FirstString submitted at least three grant applications to the federal government (the "Grant Applications") in which Ghatnekar was named as the principal investigator and the CEO of FirstString. Two Grant Applications were submitted to NIH and one to DOD. The NIH applications included Ghatnekar's forged signature and were submitted under Ghatnekar's electronic Research Administration ("eRA") account. The DOD application included Ghatnekar's forged signature was submitted under

Ghatnekar's Grants.gov and electronic Biomedical Research Application Portal (eBRAP) accounts. The accounts under which the Grant Applications were submitted were personal accounts of Ghatnekar, not FirstString accounts.

340.    As shown below, the signature blocks for the NIH grant applications include the following statement that is made by the signatory of the application, which was falsely represented to be Ghatnekar.

> By signing this application, I certify (1) to the statements contained in the list of certifications and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).



341.    Incredibly, the NIH grant applications included a cover letter with a *forged* electronic signature of Ghatnekar and proposed *future salary* for Ghatnekar, who had been

terminated when the NIH Grant Applications were filed. One of the cover letters is shown

below:



342.    As shown below, a third Grant Application was submitted to the United States

Department of Defense ("DOD") under Ghatnekar's signature after he was terminated.

51

| 15. ESTIMATED PROJECT FUNDING | 16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS? | |
|---|---|---|
| a. Total Federal Funds Requested | 600,000.00 | a. YES ☐ THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON: |
| b. Total Non-Federal Funds | 0.00 | DATE: |
| c. Total Federal & Non-Federal Funds | 600,000.00 | b. NO ☒ PROGRAM IS NOT COVERED BY E.O. 12372; OR |
| d. Estimated Program Income | 0.00 | ☐ PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW |

**17.** By signing this application, I certify (1) to the statements contained in the list of certifications* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances * and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)

☒ I agree

*The list of certifications and assurances, or an Internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

**18. SFLLL (Disclosure of Lobbying Activities) or other Explanatory Documentation**

| | Add Attachment | Delete Attachment | View Attachment |

**19. Authorized Representative**

| Prefix: | Dr. | First Name: | Gautam | Middle Name: | |
| Last Name: | Ghatnekar | | | Suffix: | Ph.D. |
| Position/Title: | President and CEO |
| Organization: | FirstString Research, Inc. |
| Department: | | Division: | |
| Street1: | 100 West Coleman Blvd. |
| Street2: | Suite 203 |
| City: | Mount Pleasant | County / Parish: | |
| State: | SC: South Carolina | Province: | |
| Country: | USA: UNITED STATES | ZIP / Postal Code: | 29464-5641 |
| Phone Number: | 843-860-8785 | Fax Number: | |
| Email: | ghatnekar@firststringresearch.com |

| Signature of Authorized Representative | Date Signed |
|---|---|
| Gautam Ghatnekar | 09/30/2021 |

343.    Again, the DOD Grant Application named Ghatnekar as the principal investigator and sought a salary for him. Further, the DOD Grant Application included letters of support from (i) University of Arkansas' Winthrop P. Rockefeller Cancer Institute, (ii) KThrall Consulting, LLC and (iii) Lovelace Biomedical. The letters were all dated *after* Ghatnekar's termination from FirstString but were addressed to Ghatnekar. Upon information and belief, FirstString requested that these letters be addressed to Ghatnekar to cover up FirstString's fraudulent scheme to seek federal grant funding under Ghatnekar's name while avoiding paying him a Grant Bonus.

344.    Ghatnekar did not authorize FirstString to forge his signature, to submit the Grant Applications under his name or through his personal eRA and eBRAP accounts, to include a future salary to him as part of the funds requested, to hold him out as the current CEO of FirstString, or to otherwise represent that he, a *former* employee of FirstString, was somehow involved with these Grant Applications such that he could be the Principal

Investigator or otherwise oversee the use of the federal funds requested in the Grant Applications. Upon information and belief, FirstString internal emails (including email with David Leffell) discussed maintaining Ghatnekar as principal investigator on the Grant Applications until they were funded, at which time they could be corrected.

345. Upon information and belief, Ghatnekar was the person at FirstString who was most capable of overseeing the research associated with the Grant Applications, and his participation in the research would make NIH and DoD more likely to fund the Grant Applications, since his credentials would be part of the review criteria and funding decision.

346. Upon information and belief, Ghatnekar's name was forged in the Grant Applications as a result of direction from Dr. David Leffell.

347. Further, upon information and belief, Dr. Leffell intentionally kept information about Ghatnekar's departure from FirstString from federal agencies overseeing the research and development efforts pursued by FirstString. For example, on a September 7, 2021 call with the BARDA to discuss the status of ongoing research under one of the Funded Grants, Dr. Leffell instructed FirstString employees not to reveal to BARDA the fact that Ghatnekar was no longer with FirstString.

348. Ghatnekar has assisted NIH in the review and approval process for grant applications. Upon information and belief, FirstString believes that Ghatnekar's background with NIH and its grant review process helps positively influence grant applications that are submitted under his name.

349. FirstString's submission of the Grant Applications under Ghatnekar's name and through his eRA commons account were done for the purpose of increasing the likelihood that the Grant Applications would be funded, both as a result of his prior work with NIH, his

reputation, his publication record, as well as his technical expertise as the founder and co-inventor associated with the subject matter of the Grant Applications.

350.    Further, the materiality of these false representations is established by NIH and DOD Grant rules.  For example, section 8.1.2.6 of the NIH Grants Policy requires prior approval for a significant change in status of principal investigator or other key personnel, and the request must be accompanied by a "strong scientific justification" related to the proposed change.  Further, the DOD's Congressionally Directed Medical Research Programs Award Guide for Funded Investigators provides that "any changes in [principal investigator] and/or key personnel listed in the award must be reviewed and approved prior to implementation of the changes" and goes on to note that changes in the principal investigator may not be allowed for certain award types, including clinical trials.

351.    As shown above, the Grant Applications and Funded Grants include false statements of material fact made for the purpose of obtaining funding.

352.    Upon information and belief, until the filing of the State Action, FirstString had not notified FDA, NIH, DOD, or other relevant federal agencies of the false representations in the Grant Applications or the Funded Grants or of Ghatnekar's termination from FirstString.

353.    In the State Action, Ghatnekar moved for a temporary restraining order requiring FirstString to correct the representations made to the NIH, DOD, FDA, and other federal agencies with regard to his status at FirstString.

354.    Only after Ghatnekar pursued the State Action and/or the motion for temporary restraining order filed therein, FirstString took steps to correct the false information with regard to Ghatnekar's status in the Grant Applications, Funded Grants, the FDA, and with other federal agencies.

355.    Upon information and belief, FirstSting filed the Grant Applications and pursued the Funded Grants under Ghatnekar's name after Ghatnekar's termination because Ghatnekar's association with FirstString made it more likely that FirstString would obtain the new funding and maintain currently funded awards while avoiding paying Ghatnekar the Grant Bonus, one of FirstString's motives for Ghatnekar's termination.

*Withholding Non-FirstString Information*

356.    Shortly after Ghatnekar's termination, FirstString demanded Ghatnekar's computer equipment be immediately provided to FirstString.  Ghatnekar had a FirstString laptop on which FirstString information was contained as well as other information, including personal information (such as photographs and videos of his family and other personal matters, collectively, the "Personal Images") and Regranion information (the personal information and Regranion information is the "non-FirstString Information").

357.    Ghatnekar's use of the FirstString laptop for personal use and for Regranion purposes did not violate any FirstString policies or breach any obligations that Ghatnekar owed to FirstString.

358.    FirstString did not have any policies that prevented Ghatnekar from using his FirstString computer for non-FirstString purposes.

359.    In response to the demand for computer equipment, Ghatnekar copied the contents of the FirstString laptop to his personal laptop, deleted the FirstString information from his personal laptop (despite his equity position in FirstString), and deleted the non-FirstString Information from the FirstString laptop.

360.    Thereafter, Ghatnekar was prepared to return the FirstString laptop to FirstString.  However, FirstString demanded both computers, threating police intervention and

55

judicial action, based on FirstString's unsupported assertions of breach of confidentiality and breach of fiduciary duty.

361.    Ghatnekar knew he had not breached any obligations owed to FirstString or misappropriated any confidential information, so on September 1, 2021, Ghatnekar agreed with FirstString that he would provide both computers to FirstString and consented to a forensic image of both computers for the sole purpose of confirming that he had not breached his obligations or done anything else that would serve as a basis for his termination or the threats of legal action and police intervention.

362.    By providing the non-FirstString Information as described above, Ghatnekar contracted with FirstString to allow FirstString to review the non-FirstString Information for the sole purpose of FirstString's investigation of Ghatnekar.

363.    Ghatnekar did not retain any copies of most of the non-FirstString Information that he provided to FirstString.  As a result, Ghatnekar does not have access to all of the Regranion information that was on his personal laptop, which he needs to conduct Regranion business and to move forward with his professional life.  FirstString is aware of the fact that Ghatnekar does not have a copy of the Regranion information, as FirstString demanded that Ghatnekar refrain from taking any of the Regranion information with him.

364.    On October 1, 2021, Ghatnekar had an online meeting with FirstString's counsel to get his personal computer back as well as the non-FirstString files that were on the personal computer.  During the meeting, Ghatnekar was allowed to review a folder titled "Regranion" that once resided on the personal computer to confirm that none of FirstString's confidential information was in the Regranion folder so that its contents could be returned to Ghatnekar.

365.    At the meeting, it became clear that, despite FirstString's assertions that Ghatnekar stole FirstString's confidential information, FirstString had not actually reviewed the non-FirstString Information to determine whether it contained any of FirstString's confidential information.  If FirstString had any *legitimate* basis to assert that Ghatnekar's breached his confidentiality obligations (if any), then the contents of the personal computer would have been fully reviewed during the previous *month* to confirm that no confidential FirstString information was present.

366.    The fact that the contents were not completely reviewed by FirstString during the course of the month demonstrates that FirstString is holding Regranion's information to harm Regranion's business, rather than investigate Ghatnekar's asserted wrongdoing.  Further, the lack of review reflects FirstString's true intention behind the preservation letters: to harm Regranion.

367.    Since the computers were provided, FirstString has refused to return the non-FirstString Information (including Regranion information) to Ghatnekar, despite the fact that FirstString has had time to review the Regranion information to conclude that it does not include any of FirstString's confidential information.  Further, as of this filing, FirstString has not identified to Ghatnekar, or to the court in the State Action, a single Regranion document that includes, or was derived from, FirstString's alleged confidential information, despite having all of Ghatnekar's Regranion documentation.

368.    Ghatnekar has revoked FirstString's access to the non-FirstString Information that was provided for when he agreed to provide the computers and has demanded its return, which FirstString has refused.

### FOR A FIRST CAUSE OF ACTION
**(Violation of the South Carolina Wage Payment Act against FirstString)**

369.    Ghatnekar incorporates by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

370.    Defendant FirstString is an employer as defined in the South Carolina Wage Payment Act ("SCWPA").

371.    The SCWPA requires that discharged employees, regardless of the reason, be paid all wages due within forty-eight (48) hours of separation or the next regular payday which may not exceed thirty days.

372.    Ghatnekar was terminated on September 1, 2021.

373.    Ghatnekar was to be paid all wages no later than September 30, 2021 and to be provided his Post-Termination Benefits no later than 60 days after termination.

374.    As of this filing, Ghatnekar has received only $1885.79, which is far less than he is presently owed.

375.    Ghatnekar is presently owed the following pursuant to the Employment Agreement: (i) his Base Salary through the date of termination; (ii) accrued, but unused paid time off based on the five weeks of vacation time provided for in section 2(f); and (iii) unpaid Grant Bonuses based off of Grants that were awarded during Ghatnekar's employment; and (iv) the Post-Termination Benefits, as FirstString did not have "Cause" to terminate him.

376.    Ghatnekar was terminated without "Cause" and, upon information and belief, for the purposes of (i) avoiding providing the Post-Termination Benefits without any factual basis, and (ii) avoiding paying Grant Bonuses on the Grant Applications, which were submitted shortly after Ghatnekar's termination under his name, and on the Funded Grants.

377.    Ghatnekar has fulfilled all of his obligations with regard to receiving the Grant Bonuses, and the course of dealing between the parties provides that the Grant Bonus is paid when the Grants are awarded.

378.    Pursuant to S.C. Code Ann. Section 41-10-80, Ghatnekar is entitled to three times the amount of unpaid monies demanded herein, plus costs and reasonable attorney's fees.

379.    Upon information and belief, McConnell and/or other FirstString agents were control persons that controlled the decision to terminate Ghatnekar.  Ghatnekar intends to pursue discovery into the identity of the control persons behind the decision to terminate him and withhold the payments described above and to name such control persons as third party defendants under this cause of action.

## FOR A SECOND CAUSE OF ACTION
### (Declaratory Judgment against FirstString)

380.    Plaintiffs incorporate by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

381.    Under 22 U.S.C. §2201, this Court has the power to declare the rights, status and other legal relations whether or not further relief is or could be claimed as a result of the actual controversy between the parties on the issues described herein.

382.    Due to the facts, conditions and circumstances set forth in this Complaint, an actual and justiciable controversy has arisen and exists regarding FirstString's ability to keep the non-FirstString information and the Employment Agreement, specifically:

       a.    the applicability of the Consultant Proprietary Information and Inventions Agreement or the Employee Proprietary Information and Inventions Agreement, as well as the enforceability of the inventions assignment and

the obligation to disclose inventions under such agreements (if one of them applies); and

    b.  the timing for the payment of the Grant Bonus.

383.    Ghatnekar is entitled to an Order from this Court declaring that:

    a.  the Employment Agreement does not include either the Employee Proprietary Information and Inventions Agreement or the Consultant Proprietary Information and Inventions Agreement because there was no meeting of the minds as to which applied;

    b.  in the event that the Employment Agreement includes the Employee Proprietary Information and Inventions Agreement, the assignment of intellectual property contained in such agreement is unenforceable and the obligation to disclose Inventions is unenforceable;

    c.  the obligation to pay the Grant Bonus arises when the Grants are awarded, which is either when a notice of award is issued for a grant or when a signed contract is obtained for a research contract;

    d.  if the obligation to pay the Grant Bonus arises when funds are actually received in FirstString's bank account, which is denied, then the duty of good faith and fair dealing obligates FirstString to pursue, in good faith, all funding under Funded Grants and to pay Ghatnekar the Grant Bonus within sixty (60) days of receipt of such funds; and

    e.  FirstString does not own and is obligated to return the non-FirstString Information to Ghatnekar.

384.    Therefore, Plaintiff hereby requests a declaratory judgment be issued by the Court including all of the relief set for above.

## FOR A THIRD CAUSE OF ACTION
### (Breach of Contract –  Employment Agreement against FirstString)

385.    Ghatnekar incorporates by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

386.    FirstString has breached the Employment Agreement by failing to pay Ghatnekar the money he is owed.

387.    Ghatnekar has been damaged as a result of FirstString's breach of the Employment Agreement as provided herein.

## FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract Accompanied by a Fraudulent Act –  against FirstString)

388.    Ghatnekar incorporates by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

389.    FirstString has breached the Employment Agreement as stated herein.  Furthermore, FirstString breached the contract with Dr. Ghatnekar with fraudulent intent and committed fraudulent acts accompanying the breach, including but not limited to one or more of the following:

a.    Improperly threatening and knowingly falsely representing to Dr. Ghatnekar and others that Dr. Ghatnekar was being terminated for cause so as to attempt to avoid paying him what he is owed under the Employment Agreement, interfere with his business interests that were not competitive with FirstString, and improperly attempting to appropriate those business interests for its own;

b.    Knowingly falsely representing to Dr. Ghatnekar and others that he was secretly and improperly involved in business matters with Regranion when FirstString

was aware of that involvement and had repeatedly published to its board, investors, and others that he was involved with Regranion;

      c.      Knowingly falsely representing to Dr. Ghatnekar that he could not keep a copy of the non-FirstString Information in order, among other things, to attempt to prevent him from conducting business that was not competitive to FirstString and that FirstString wanted to appropriate for its own;

      d.      Knowingly falsely representing to Dr. Ghatnekar and third parties that FirstString had certain unspecified "trade secrets" and that Dr. Ghatnekar had misappropriated them;

      e.      Knowingly attempting to enforce an unenforceable Proprietary Information and Inventions Agreement;

      f.      Knowingly falsely representing to Dr. Ghatnekar and to third parties that Dr. Ghatnekar had stolen FirstString funds and misappropriated or misused FirstString's resources;

      g.      Knowingly falsely representing to Dr. Ghatnekar and to third parties that Dr. Ghatnekar misappropriated a FirstString business opportunity in connection with RGRN-305, even though Curis, the owner of the patent, had specifically rejected repeated requests by Dr. Ghatnekar and others to license RGRN-305 to FirstString over two years before Curis gave a license to Regranion;

      h.      Sending an improper data preservation letter without proper justification to third parties for the improper purpose of interfering with Dr. Ghatnekar's business interests and prospective contracts and with the improper intent of attempting to appropriate that business for FirstString; and

i.    After terminating Dr. Ghatnekar's employment, forging Dr. Ghatnekar's name on the Grant Applications and related documents and submitting them using his personal accounts to federal agencies in violation of law and fraudulently including a budget for payment to Dr. Ghatnekar in order to, among other things, avoid paying Dr. Ghatnekar additional Grant Bonuses he would otherwise have been entitled to receive and to deceive the federal government into believing Dr. Ghatnekar had submitted the applications and would be involved with the activities that were the subject of the applications;

390.    Accordingly, Dr. Ghatnekar should be awarded actual damages for breach of contract and punitive damages.

## FOR A FIFTH CAUSE OF ACTION
### (Defamation – By Ghatnekar against FirstSting and McConnell)

391.    Ghatnekar incorporates by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

392.    McConnell's statement to employees of FirstString that Ghatnekar improperly used FirstString's resources, which conveyed that he stole money from FirstString, was false and was not subject to any privilege.  McConnell was acting as an agent of FirstString when the statement was made, so FirstString is liable, under the doctrine of respondent superior, for McConnell's defamatory conduct.

393.    McConnell published the slanderous statement in Charleston County when he told FirstString employees and agents, including, but not limited to, Tony Bartsh, Grant Carwile, Dr. David Leffell, Andrea Marshall, Dr. Christina Grek, Dr. Carissa James, Stefanie Cuebas, Dr. Travis McQuiston, and Ms. Susanne Haugebak.

394.    The slanderous statement was made with actual and/or common law malice and intended to impeach Ghatnekar's honesty, integrity, and business reputation.

395.    Ghatnekar intends to engage in discovery directed towards additional defamatory statements made by McConnell, such as those made to Jamie McNab and Jim McNab, and reserves the right to amend this claim to assert these defamatory statements as additional bases for recovery.

396.    McConnell's defamatory statement regarding FirstString's resources is actionable per se because the false statement accuses Ghatnekar of a crime and/or unfitness in his business or profession.

397.    The defamatory statement harmed Ghatnekar's reputation and has caused special damages to Ghatnekar.

398.    Ghatnekar is entitled to general damages, special damages, punitive damages and preliminary and permanent injunctive relief preventing Defendants from publishing further defamatory statements regarding Ghatnekar and requiring Defendants to correct the defamatory statements.

## FOR A SIXTH CAUSE OF ACTION
### (Tortious Interference with Prospective Contractual Relations – by Regranion against FirstString)

399.    Ghatnekar and Regranion incorporate by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

400.    Upon information and belief, FirstString identified Regranion's prospective clients by interviewing FirstString's employees for the stated purpose of conducting an investigation. However, the true purpose of determining the identity of Regranion's prospective clients was to interfere with Regranion's prospective contractual relations.

Soliciting Regranion's prospective business clients from FirstString's employees in this fashion is an improper method used solely to interfere with Regranion's business.

401.   Further, the preservation letter was not sent for any proper purpose but rather to intentionally interfere with Regranion's prospective contractual relationships.  As a result of the preservation letter, at least one company has stopped moving forward with a contractual relationship with Regranion.

402.   Neal McConnell's statements to Ghatnekar that the purpose of the data preservation letters was to stop Regranion from being able to do business demonstrates the improper purpose of the preservation letters.  Further, the fact that, FirstString has had possession of Ghatnekar's computers for an extended period of time but, upon information and belief, did not conduct a reasonable inspection of the non-FirstString Information, establishes that FirstString was not actually concerned with data preservation when the preservation letters were sent.

403.   Regranion is entitled to damages, punitive damages and an injunction prohibiting further interference with Regranion's prospective customers.

## FOR A SEVENTH CAUSE OF ACTION
### (Conversion)

404.   Ghatnekar and Regranion incorporate by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

405.   FirstString has without authorization refused to return the non-FirstString Information after being instructed to do so by Ghatnekar.  By exercising dominion and control over the non-FirstString Information, FirstString has converted the non-FirstString Information.

406.     Ghatnekar has suffered damages as a result of this conversion and is entitled to damages and equitable relief in the form of return of all copies of the non-FirstString Information.

### FOR AN EIGHTH CAUSE OF ACTION
#### (Indemnification – Against FirstString)

407.     Ghatnekar and Regranion incorporate by reference the consistent and relevant portions of the preceding paragraphs as if set forth herein.

408.     Ghatnekar is entitled to indemnification for the claims against him in this lawsuit under FirstString's Bylaws and the Employment Agreement.

WHEREFORE, Plaintiffs respectfully request a trial by jury and the following relief:

    a.     Enter judgment for Ghatnekar and Regranion on all counts;

    b.     Enjoin FirstString from further contacting third parties in an attempt to stop Regranion from engaging in lawful business practices;

    c.     Enjoin FirstString and McConnell from publishing any defamatory statements regarding Ghatnekar;

    d.     Enjoin FirstString by requiring FirstString to deliver all copies of the non-FirstString Information to Ghatnekar;

    e.     Award money damages to Plaintiffs for all economic, special and consequential damages;

    f.     Award treble damages and punitive damages to Plaintiffs;

    g.     Award Plaintiff's costs and reasonable attorney's fees;

    h.     Order FirstString to indemnify Ghatnekar for the claims against him in this lawsuit; and

    i.     Award all available interest and such other and further relief that this Court determines to be just and proper under the circumstances.

December 21, 2021

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

/s/ *Robert Y. Knowlton*_____

Jeffrey T. Stover, DSC Id. No. 10868
Perry MacLennan, DSC Id. No. 12008
134 Meeting Street, 3rd Floor
Charleston, South Carolina 29401
Telephone: (843) 720-4506
Facsimile: (843) 722-2266
jstover@hsblawfirm.com
pmaclennan@hsblawfirm.com

Robert Y. Knowlton, DSC Id. No. 2380
1201 Main Street, 22nd Floor
Columbia, South Carolina 29201
803-779-3080
bknowlton@hsblawfirm.com